# Illinois Official Reports

## Appellate Court

***People v. Franklin*, 2020 IL App (1st) 171628**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME FRANKLIN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-1628 |
| Filed | September 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 92-CR-23967; the Hon. William H. Hooks, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justice Lampkin concurred in the judgment and opinion.<br>Justice Burke dissented, with opinion. |

**OPINION**

¶ 1        Defendant, Jerome Franklin, claims that the trial court erred by denying him leave to file a successive postconviction petition challenging his sentence.

¶ 2        Defendant, age 18, was convicted after a bench trial of first degree murder and sentenced to imprisonment for the rest of his natural life. Defendant claims that, as applied to him, a sentence of life without the possibility of parole violates the eighth amendment and the proportionate penalties clause, when he did not have a single prior adult or juvenile conviction and when one considers his youth in conjunction with his mental health, substance abuse, and other issues at the time of the offense.

¶ 3        For the following reasons, we find that his petition meets the very low threshold required for merely filing.

## BACKGROUND

¶ 5        Defendant was convicted of the murder of his six-month-old son. When the baby was born, defendant's girlfriend, the baby's mother, was only 15 years old, and defendant was 17 years old and had left school in the tenth grade. When the baby died, defendant was five months past his eighteenth birthday. The assistant medical examiner testified that some of the baby's injuries were newer and others were more remote in time. A detective testified that, shortly after defendant was arrested, defendant told him "that he thought he needed help. He said things would run through his mind. He couldn't control himself." After his arrest, defendant was diagnosed at Cermak Hospital with a nonspecific psychosis and treated with psychotropic medication. Prior to trial, the trial court conducted fitness hearings and ultimately found defendant fit to stand trial.

## I. Evidence at Trial

¶ 7        In this court's prior order denying defendant's direct appeal (*People v. Franklin*, No. 1-97-0514 (1998) (unpublished order under Illinois Supreme Court Rule 23)), we described the facts established at trial. In summary, Katherine Means, also known as Katherine Taylor, was the baby's mother and defendant's girlfriend. On Thursday, September 17, 1992, Katherine, age 16, and defendant, age 18, went to Katherine's mother's house to retrieve their baby. Katherine's mother refused to give defendant the baby, so Katherine went into her mother's house to retrieve Jerome Jr., age six months.

¶ 8        Katherine's mother, Dorothy, told Katherine that Jerome Jr. had a cold, a diaper rash, was teething, and had a scratch on his chest, which she noticed while changing his diaper, but no other injuries.

¶ 9        The couple then took Jerome Jr. to Katherine's aunt Regina Taylor's apartment. Katherine's friend, Karen Jones, lived in the same building and observed Katherine, defendant, and the baby and observed that the baby was fine. Katherine, defendant, and the baby spent the night in a bedroom in Regina's apartment.

¶ 10        On Friday, September 18, Katherine awoke around noon and fed and bathed Jerome Jr. She noticed scratches on the left side of the baby's neck that were not there the previous day. Katherine spent the rest of the day at Karen's apartment while defendant had possession of the baby.

¶ 11    On Saturday, September 19, Katherine again woke around noon and went to Karen's apartment. She was "in" and "out" of Karen's house during the afternoon, helping Karen clean her home. Defendant had possession of the baby at Regina's apartment. Katherine returned to Regina's apartment to check on the baby and defendant at around 7 p.m. and found the two asleep in the bedroom. Katherine returned to Karen's apartment, where she remained until around 11 p.m. Returning to Regina's apartment, Katherine noticed that the baby's head was "hanging like a rag doll" and "he had been sleeping all day," which was unusual for the baby. Katherine noticed the scratches that she had observed on the baby's neck the day before and asked defendant what was wrong with the baby and what had happened to the baby's neck.

¶ 12    Katherine testified defendant told her, "we have to talk." She said he told her the baby was crying all day. Defendant also said he "called [Jerome Jr.] a sissy and *** bit [Jerome Jr.] *** on his shoulders."

¶ 13    Katherine woke up the next morning at around noon, and the baby's condition appeared worse. The baby was "not responding to [Katherine], *** he just was looking, like staring off into space. If [Katherine] would talk to him or try to talk to him he wouldn't respond." He made "little sighs" throughout the day. Katherine showed the baby to Karen. Karen noticed what she believed was a burn mark on Jerome Jr.'s neck. The mark was oozing juicy flesh, and upon closer inspection, Karen saw bite marks.

¶ 14    That night, Katherine took a bath, leaving the baby with defendant. When she returned, she laid the baby on her chest and went to sleep. When she woke up, after midnight, she noticed Jerome Jr. had stopped breathing. Katherine screamed and ran to Karen's house. Karen's boyfriend called an ambulance. Karen said the baby's entire body was blue.

¶ 15    While they waited for the ambulance, defendant and Katherine went into the hallway. Katherine testified defendant told her to think of a name and tell the police it was that person's fault the baby died. Paramedics arrived 10 minutes later and took Jerome Jr. to the hospital.

¶ 16    Lynn Huffman, a paramedic firefighter, testified that paramedics attempted CPR and other emergency measures, but Jerome Jr. did not respond. Huffman noticed the baby's left shoulder had bruises and burn marks, the baby's abdomen was bruised, and there were scabbed cuts all over his chest. He estimated the baby had been dead for at least 10 minutes.

¶ 17    While at the hospital, Officer Anthony Mickel observed the baby's body and said he observed "bruises and burn marks from [the baby's] neck to his feet. He had bite marks also on his back and shoulders. He had what appeared to be bruises or burns *** on the bottom of one foot. And *** what appeared to be trauma to the groin area."

¶ 18    Katherine testified before a grand jury that she did not burn or strike the baby and that no one else except defendant took care of the baby the weekend of September 18.

¶ 19    The doctor who attended Jerome Jr. testified the baby was essentially dead on arrival. The baby had many fresh abrasions and some that were healing. The doctor identified circular marks on Jerome Jr.'s back consistent with bite marks and found bruises on the baby's back and chest as well as blisters on the soles of his feet.

¶ 20    Detective Michael Rose spoke with defendant who claimed to have had no involvement in his son's death. Defendant told Detective Rose, "until the baby walks, that baby is none of his responsibility and he wanted nothing to do with the baby until the time it walked."

¶ 21    Later, defendant told the police that Katherine caused the baby's injuries. He claimed Katherine shook the baby, the baby's eyes became really wide, and the baby did not act the

same afterwards. Defendant said he bit and slapped the baby to make him respond and that Katherine held the baby up to an open or uncovered light and burned the baby's back.

¶ 22 Subsequently, defendant told Detective Rose that he thought he needed help, that things kept running through his mind, and that he could not control himself. Defendant said the baby was crying all that day Friday and that defendant slapped the baby's legs several times in an attempt to make him stop crying. However, the baby continued to cry most of Saturday. Around 3 p.m. Saturday, defendant lifted Jerome Jr. and shook him. The baby's eyes became really large, and he never appeared the same again. Defendant said he slapped Jerome Jr.'s chest and bit his shoulders to try to elicit a response. He bit the baby several times on Sunday for the same purpose. Defendant signed a statement attesting to these facts, read it out loud, and made corrections to it in front of the officers and an assistant state's attorney.

¶ 23 Dr. Robert Kirschner testified that he performed the autopsy on Jerome Jr. Dr. Kirschner said the baby had multiple injuries, both fresh and healing. The left side of the baby's head was bruised, as was the left outer margin of the baby's left eye and cheek. There was also a fresh tear in his upper lip, which was still bleeding, caused by blunt force from a fist or hand or an object being forced into his mouth. There were bruises to the baby's forehead and the side of his face that were probably caused by a fist or hand. Jerome Jr.'s neck was covered with abrasions that were healing. The baby's left shoulder had numerous abrasions and contusions, most notably bite marks.[1] These marks ranged in age from a day or two to several days old. Jerome Jr.'s body had bite marks on the right shoulder that were also several days old. The bruises on the baby's face and head were more recent, having occurred 12 to 24 hours before the baby's death. Dr. Kirschner also noted severe bruises and abrasions to Jerome Jr.'s left buttock cause by a hand or fist. There was also a burn to the mid-level of the baby's back that was four to five days old. Both of Jerome Jr.'s feet had burns and blisters, some of which were ruptured. Dr. Kirschner opined that the burns were caused by a hot circular object such as a heated spoon or a light bulb.

¶ 24 Dr. Kirschner testified there was internal hemorrhaging under the baby's scalp due to blunt trauma. There were several areas of impact on his head and bruising of his brain, which the doctor said was the result of the baby being struck by a fist or hand or some other object, for example a telephone book. Dr. Kirschner said bruising, like that in this case, is inconsistent with "shaken baby syndrome" and that the injuries here resulted from "a lot of force, *** violent force." The hemorrhaging in the left occipital region of the head caused the baby to become comatose immediately, thereby precluding normal activity after the injury occurred. Dr. Kirschner opined that the baby died as the result of multiple injuries due to child abuse, in particular blunt head trauma with subdural hematoma and bruising to the brain. The manner of death was homicide.

---

[1]Dr. John Kenny, a forensic odontologist, testified the bite marks were made by defendant. The use of bite mark evidence has since been called into question, but this does not affect the issues before us. See, *e.g.*, Radley Balko, *Incredibly, Prosecutors Are Still Defending Bite Mark Evidence*, Wash. Post (Jan. 30, 2017), https://www.washingtonpost.com/news/the-watch/wp/2017/01/30/incredibly-prosecutors-are-still-defending-bite-mark-evidence/ [https://perma.cc/8GH5-G8C3] ("As of today, bite mark evidence has led to more than two dozen wrongful arrests or convictions.").

¶ 25                                II. Psychological Evidence at Trial

¶ 26     In addition to the evidence concerning the murder, the following psychological evidence regarding defendant was also admitted at trial.

¶ 27     Dr. Michael Stone, a psychologist called by the defense, was accepted by the court as an expert in forensic psychology.[2] Based on Stone's review of the records from Cermak Hospital, Stone testified that defendant had been placed in full leather restraints for close to two weeks after his arrest in 1992 and was given "strong dosages of medication." Stone explained that restraints are "a last line of defense," with the preference always being for the least restrictive treatment. Three years later, in August 1995, while incarcerated, defendant was again hospitalized for psychosis. After psychological testing, Stone diagnosed defendant as a paranoid schizophrenic. Stone observed that one of the psychiatrists who had found defendant fit to stand trial "also continued a treatment regime of anti-psychotic and anti-depressants at a high level," which is how "you would treat someone who was psychotic." Based on Stone's review of the records and his own examination and testing of defendant, Stone opined that, at the time of the offense, defendant was severely impaired, both mentally and emotionally, such that he was unable to appreciate the criminality of his actions and unable to conform his actions to the requirements of the law.

¶ 28     In rebuttal, the State called three mental-health doctors, Dr. Matthew Markos, Dr. Paul Fauteck, and Dr. Roni Saltzberg, who had examined defendant prior to trial and determined that he was fit to stand trial. All three doctors had the same employer, namely, the Psychiatric Institute, which is part of the forensic clinical services of the circuit court of Cook County. Dr. Markos and Dr. Saltzberg are psychiatrists, and Dr. Fauteck is a psychologist. The trial court found Drs. Markos and Saltzberg[3] qualified as experts in forensic psychiatry and found Dr. Fauteck qualified as an expert in forensic psychology.

¶ 29     Dr. Saltzberg testified that it was her opinion that defendant was "legally sane at the time of the alleged offense," although he suffered from personality and substance abuse disorders. Saltzberg interviewed defendant in 1994, a couple of years after the offense, and agreed that, "of all schizophrenics," paranoid schizophrenics are the "most adept at hiding their symptoms."

¶ 30     Dr. Markos testified that he interviewed defendant once, for 45 minutes to an hour on November 19, 1993, which was over a year after the baby's death and when defendant was being actively treated with Thorazine, Haldol, Prozac, and Cogentin. Dr. Markos acknowledged that Thorazine is an anti-psychotic medication used in the acute management of psychosis, that Haldol is an anti-psychotic medication used for chronically psychotic patients, that Cogentin is used to counteract the side effects of medications like Thorazine and Haldol, and that Prozac is an anti-depressant. Dr. Markos opined that these drugs were used to treat defendant's symptoms. Dr. Markos also acknowledged that psychosis could cause the behavioral problems that defendant exhibited after his arrest that required leather restraints.

---

[2]Defense counsel asked the trial court to find the witness to be "declared an expert in the field of forensic psychology." The prosecutor objected, and the trial court stated "[o]verruled."

[3]The prosecutor stated that he tendered Dr. Saltzberg as an expert in forensic psychiatry, and defense counsel stated that he had one question. After the one question, the trial court stated "[p]roceed" without stating that it accepted Dr. Saltzberg as an expert, but the court and the parties appeared to proceed on that basis.

Dr. Markos acknowledged that defendant was diagnosed with psychosis, first, on November 1, 1992, and, again, two years later on August 4, 1994, at Cermak Hospital, which was both before and after his single interview with defendant. Dr. Markos opined that the notes from 1992 from Cermak Hospital indicated that defendant was hearing voices. Dr. Markos testified that he was not ruling out a mental disorder. However, "[j]ust because a person has a history of mental disorder does not necessarily mean that the person was legally insane."

¶ 31    Dr. Fauteck testified that he interviewed defendant twice, once on November 18, 1993, and once on November 28, 1994, and concluded both times that defendant was legally sane at the time of the offense. His diagnosis was of malingering and anti-social personality disorder. Dr. Fauteck testified that his opinion of malingering was supported, in part, by the "extreme elevation" of defendant's test scores and by defendant's present lack of medication. However, Dr. Fauteck admitted on cross-examination that patients, like defendant, who are in their late teens and members of minority groups often score much higher on these tests and that there is a disorder known as "schizophrenia short form disorder" that has the same characteristics as schizophrenia but lasts only six months at a time.

¶ 32                                  III. Conviction and Sentencing

¶ 33    After listening to the evidence and closing arguments by counsel, the trial court found defendant guilty of murder. On December 12, 1996, the State sought the death penalty due to the heinous nature of this crime, and the trial court found defendant death-penalty eligible. The presentence investigation report indicated that defendant had no prior adult or juvenile convictions. Defendant left school in the tenth grade and worked in part-time jobs, such as a cook at Kentucky Fried Chicken and as a bagger at a Jewel Food Store. A letter from Cook County jail indicated that he was enrolled in a GED program there. His most recent behavioral clinical exam diagnosed him as having "a mixed personality disorder."

¶ 34    An alternative sentencing report provided by the defense supplied additional facts, such as that defendant had to repeat the ninth grade. His mother reported that he had been hospitalized for two separate head injuries where he lost consciousness and that he frequently complained of headaches and dizzy spells. Prior to the offense, he was using crack cocaine twice a week to deal with "inner turmoil." Both defendant and his mother confirmed that defendant suffered from auditory hallucinations. A doctor from the Psychiatric Institute had diagnosed defendant as having a "low average/borderline range intelligence."

¶ 35    Several witnesses testified at the ensuing death-penalty hearing. In aggravation, the State called Veronica Franklin, defendant's half-sister; Katherine, defendant's girlfriend and mother of the victim; and Officer George Parker, who testified that, in 1991, he found defendant in possession of a handgun but defendant was not charged.

¶ 36    In mitigation, the defense called John Sturman,[4] a professional sentencing advocate, whose occupation was the preparation of mitigation reports in death penalty cases. Based on his interviews with the family, Sturman testified that defendant's stepfather was abusive and that the family had moved 20 times in 15 years.

---

[4]Although the court reporter at the sentencing hearing transcribed his last name as "Stern," a report filed by him in the record states that his name is "Sturman."

¶ 37    Defendant's age was discussed at the hearing only to establish that his age qualified him for death-penalty consideration. The parties stipulated that, on the date the baby died, defendant "was over the age of 18 years old."

¶ 38    At the end of the hearing, the trial court announced that it had considered all the evidence and found "that there are mitigating factors that preclude the imposition of the death sentence." However, the trial court did not specify what these mitigating factors were or state anything about the facts or considerations which had led the court to this finding. The trial court stated only: "I therefore sentence the Defendant on the one count of first degree murder to a term of natural life without parole in the Illinois Department of Corrections." The trial court offered no reasons, findings, or explanations for the imposition of a life-without-parole sentence. The only statement made by the trial court concerning defendant's motion to reconsider sentence was: "Motion to Reconsider the Sentence will be denied." The motion had listed no grounds or reasons for reconsidering the sentence.

¶ 39                          IV. Appeal and Postconviction Proceedings

¶ 40    On direct appeal, this court affirmed defendant's conviction and sentence. *Franklin*, No. 1-97-0514, slip order at 11-13. Defendant subsequently filed four *pro se* postconviction petitions and three *pro se* petitions pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). One petition was entitled a "Motion to Quash Indictment," but the court analyzed it as a section 2-1401 petition. The trial court dismissed each of these petitions, and this court affirmed these dismissals on appeal. *People v. Franklin*, No. 1-00-3060 (2002) (unpublished summary order under Illinois Supreme Court Rule 23(c)); *People v. Franklin*, No. 1-03-0592 (2004) (unpublished summary order under Illinois Supreme Court Rule 23(c)); *People v. Franklin*, No. 1-04-3653 (2006) (unpublished summary order under Illinois Supreme Court Rule 23(c)); *People v. Franklin*, No. 1-13-3284 (2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)); *People v. Franklin*, No. 1-15-1295 (2017) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 41                                        ANALYSIS

¶ 42                                    I. Successive Petition

¶ 43    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21.

¶ 44    Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [the supreme] court has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed." *Edwards*, 2012 IL 111711, ¶ 22. Those two bases are (1) cause and prejudice and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. Defendant has alleged only the former.

¶ 45    Under the cause-and-prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 46    Defendant established cause because he could not have raised claims based on *People v. House*, 2019 IL App (1st) 110580-B, *People v. Harris*, 2018 IL 121932, and *Miller v. Alabama*, 567 U.S. 460 (2012), until those cases were decided. This court has made this same finding

repeatedly in other similar cases. See *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 31; *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 108 (where defendant filed his original petition years before *Miller*, we found that he established cause to raise a *Miller* claim since he "certainly could not have raised a claim based on a line of cases that had not even been decided yet"); see also *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 48 (defendant was not barred from raising his challenge on appeal from the denial of leave to file a successive petition, where "*Miller* was not available for earlier postconviction proceedings"); *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 19 (*Miller* "changed the law and gave postconviction petitioners cause for failing to raise the issue in proceedings that preceded" it).

¶ 47                                    II. Eighth Amendment

¶ 48    To determine prejudice, defendant asks us to look toward recent law under both the eighth amendment and the proportionate penalties clause.

¶ 49    In the case at bar, there is no question that defendant received a life sentence since he was sentenced to natural life without the possibility of parole. However, there is also no question that defendant was over 18 years old. It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases. *Harris*, 2018 IL 121932, ¶¶ 59-61.

¶ 50    Although defendant was five months past his eighteenth birthday at the time of his offense, he argues that his youth in conjunction with his mental health and other issues demonstrate that a life sentence was inappropriate. In other words, the argument with respect to the eighth amendment is that his mental health and other issues at the time of the offense made him the functional equivalent of a juvenile and, thus, his sentence is unconstitutional as applied to him.

¶ 51    Although defendant raises an as-applied challenge rather than a facial challenge, Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment. *E.g.*, *Minniefield*, 2020 IL App (1st) 170541, ¶¶ 37-38 (considering a 19-year-old defendant's as-applied sentencing claim under the proportionate penalties clause rather than the eighth amendment). This is because federal cases have generally drawn a line at 18 years of age (*Minniefield*, 2020 IL App (1st) 170541, ¶ 37) and because, as we explain below, the proportionate penalties clause offers a broader path to the same types of relief.

¶ 52                             III. Proportionate Penalties Claim

¶ 53    Defendant's petition alleges that his sentence is unconstitutional under the Illinois Constitution because it ignores his rehabilitative potential.

¶ 54    Like the eighth amendment, the proportionate penalties clause of the Illinois Constitution embodies our evolving standard of decency. See *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionate penalties clause and the eighth amendment). The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. This constitutional provision requires the balancing of the twin goals of retribution and rehabilitation, which

requires a careful consideration of all the factors in aggravation and mitigation, including defendant's age and mental health. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 55    "The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship." *Minniefield*, 2020 IL App (1st) 170541, ¶ 35. Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties. *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; see also *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). Unlike other constitutional provisions affecting criminal defendants, these two provisions—the eighth amendment and the proportionate penalties clause—are not in lockstep. See *Minniefield*, 2020 IL App (1st) 170541, ¶ 35.

¶ 56                    IV. Life Without the Possibility of Parole

¶ 57    As noted above, our proportionate penalties clause requires a balancing of the twin goals of retribution and rehabilitation. However, defendant's sentence of natural life without the possibility of parole provides no opportunity for "restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A sentence of life imprisonment without parole *** cannot be justified by the goal of rehabilitation. The penalty forswears altogether the rehabilitative ideal." *Graham v. Florida*, 560 U.S. 48, 74 (2010).

¶ 58    Life without parole is the most severe penalty now permitted by Illinois law, and it shares "characteristics with death sentences that are shared by no other sentences." *Graham*, 560 U.S. at 69; see also *People v. Patterson*, 2014 IL 115102, ¶ 108 (the death penalty is unique and shares characteristics with no other sentence "besides life without parole"). "Life without parole is similar to a death sentence in that it 'alters the offender's life by a forfeiture that is irrevocable.' " *People v. Utley*, 2019 IL App (1st) 152112, ¶ 108 (Gordon, J., dissenting) (quoting *Graham*, 560 U.S. at 69). A life sentence is "far more severe" when it denies the possibility of parole. *Solem v. Helm*, 463 U.S. 277, 297 (1983); see also *Graham*, 560 U.S. at 69-70. Such a sentence " 'means that good behavior and character improvement are immaterial; it means *** he will remain in prison for the rest of his days.' " *Graham*, 560 U.S. at 70 (quoting *Naovarath v. State*, 779 P.2d 944, 944 (Nev. 1989)). "It deprives the convict of the most basic liberties" without giving any "hope of restoration." *Graham*, 560 U.S. at 69-70.

¶ 59    Thus, life without the possibility of parole should be reserved for those rare offenders who are beyond hope of redemption. The record in this case does not show whether this defendant is beyond the hope of redemption.

¶ 60                            V. Age and Mental Health

¶ 61    Defendant argues that Illinois law treats young adults under 21 years of age differently than adults, and that is correct.

¶ 62    Recent and traditional legislative enactments support the view that "youthful offender[s]" are those under the age of 21. 730 ILCS 5/3-3-9(a)(1.5) (West 2018) (parole review for under 21-year-olds is called "youthful offender parole"). For example, last year, our legislature changed the law to make a person convicted of first degree murder eligible for parole after serving only 20 years if he or she was under 21 years old at the time of the offense and was

sentenced after the law took effect. Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110); Pub. Act 101-288, § 5 (eff. Jan. 1, 2020) (amending 730 ILCS 5/5-4.5-110(b) and renumbering as 730 ILCS 5/5-4.5-115(b)). Urging passage of this bill, House Majority Leader Barbara Flynn Currie argued that under-21-year-olds are "young people" who "do not always have good judgment." 100th Ill. Gen. Assem., House Proceedings, Nov. 28, 2018, at 48-49 (statements of Representative Currie). The Juvenile Court Act of 1987 defines a " '[m]inor' " as "a person under the age of 21 years subject to this Act" (705 ILCS 405/1-3(10), 5-105(10) (West 2018)), while an " '[a]dult' means a person 21 years of age or older" (705 ILCS 405/1-3(2) (West 2018)).

¶ 63    There are many other ways in which our state treats under-21-year-olds differently, such as prohibiting sales to them of alcohol (235 ILCS 5/6-16(a)(i) (West 2018)), cigarettes (Pub. Act 101-2, § 25 (eff. July 1, 2019) (amending 720 ILCS 675/1)), and wagering tickets (230 ILCS 10/18(b)(1) (West 2018)); prohibiting their gun ownership without parental permission (430 ILCS 65/4(a)(2)(i) (West 2018)); and limiting Class X sentencing for recidivist offenders to those offenders "over the age of 21 years" (730 ILCS 5/5-4.5-95(b) (West 2018)); see also *People v. Mosley*, 2015 IL 115872, ¶ 36 (a ban on handgun possession by minors under 21 does not violate the second amendment); 760 ILCS 20/2(1) (West 2018) (Illinois Uniform Transfers to Minors Act defines an adult as one 21 years of age or older).

¶ 64    The argument that mental health issues may lower a defendant's functional age also finds support in our recent caselaw. For example, this court found that the mental and emotional development of a nonjuvenile but still youthful defendant should be considered in assessing his culpability and fashioning an appropriate sentence. *House*, 2019 IL App (1st) 110580-B, ¶ 59; see also *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004) (sentencing court must consider a defendant's "mentality"); *Quintana*, 332 Ill. App. 3d at 109 (sentencing court must consider a defendant's "mentality"). Even for a mature adult, our law requires a sentencing court to consider whether, at the time of offense, a sane defendant was nonetheless suffering from a mental illness which substantially affected his ability to conform his conduct to the requirements of the law. 730 ILCS 5/5-5-3.1(a)(16) (West 2018).

¶ 65    Defendant's arguments also find support in the factual record. Although there were dueling experts at his trial and the trial court found defendant fit to stand trial, sanity is not the issue before us. A defendant is unfit to stand trial if, based on a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *People v. Cook*, 2014 IL App (2d) 130545, ¶ 12. By contrast, a mental illness may be a mitigating factor at sentencing, even if it is insufficient to undermine a defendant's fitness to stand trial. 730 ILCS 5/5-5-3.1(a)(16) (West 2018) (mental illness is one of the statutorily listed mitigating factors).

¶ 66    A review of the sentencing transcript makes clear that the trial court gave no consideration to defendant's age except for determining that it qualified him for death-penalty consideration. Not only was there no consideration of the attendant characteristics of youth, just the opposite was true. The finding was that, although he was barely over the statutory age, his age qualified him for death-penalty consideration.

¶ 67    It must be remembered that this is an 18-year-old without a single prior adult or even juvenile conviction. Dr. Stone testified, without contradiction, that the onset for schizophrenia is commonly at this age and, thus, based on defendant's age, defendant "would be precisely at risk for this problem" at the time of the offense. Defendant's mother reported, also without

- 10 -

contradiction, that defendant had suffered multiple head traumas, requiring hospitalization, and that he continued to suffer from headaches and dizzy spells. We are troubled by the seeming depravity of this offense, but it is up to the trial court to balance the seriousness of the offense with the other factors in this case, such as defendant's own repeated head traumas, his mental illness at the time of the current offense, the treatment he received in prison, and his rehabilitative potential. A reviewing court cannot observe what a trial court observes, and so it is important for the trial court to set forth its reasons.

¶ 68    The law is in the developmental stage as to the sentencing of young offenders, and it is important for a trial court to create an appropriate record during both postconviction proceedings and sentencings so that a reviewing court can understand the factors the court used in making its decision or rendering a sentence.

¶ 69    For the foregoing reasons, we find that defendant has made a sufficient legal and factual showing for his petition to be filed. We remand to allow the trial court to consider whether his mental health and other issues at the time of the offense rendered defendant functionally under 18 years old or whether, as applied to him as someone under 21 years old, his sentence of natural life without the possibility of parole violates the proportionate penalties clause of our state.

¶ 70                                    VI. Remand Required

¶ 71    Our supreme court has found that the proper vehicle for a young adult such as defendant, who is between 18 and 21 years old, to raise an as-applied challenge to a life sentence is in a postconviction proceeding. *Harris*, 2018 IL 121932, ¶ 48; *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109; see also *People v. Thompson*, 2015 IL 118151, ¶ 44 (appropriate vehicle for an as-applied challenge by a 19-year-old offender to a life sentence is a postconviction petition, "including *** a successive petition"). When a defendant claims that the evolving science discussed in *Miller* and other cases applies to young adults between 18 and 21, the trial court is the most appropriate tribunal for factual development, and it is paramount that the record be developed for this purpose. *People v. Holman*, 2017 IL 120655, ¶¶ 29-30. A ruling without a developed record is "premature." *Harris*, 2018 IL 121932, ¶ 46; *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109.

¶ 72    As in *Harris*, 2018 IL 121932, ¶ 46, and in *Minniefield*, the record in the case at bar contains "no evidence about the evolving science and its impact on defendant's case." *Minniefield*, 2020 IL App (1st) 170541, ¶ 47. Therefore, "[d]efendant has shown prejudice by establishing a 'catch-22'[5]—without a developed record, he cannot show his constitutional claim has merit, and without a meritful claim, he cannot proceed to develop a record." *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109.

¶ 73    For these reasons, we reverse and remand for second-stage postconviction proceedings. *People v. Wrice*, 2012 IL 111860, ¶ 90 ("reversing the trial court's order denying leave to file his second successive postconviction petition and remand[ing] to the trial court for *** second-stage postconviction proceedings"); *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 14 ("When

---

[5]"A 'catch-22' is defined as '[a] dilemma or difficult circumstance from which there is no escape because of mutually conflicting or dependent conditions.' " *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109 n.17 (quoting Lexico, https://www.lexico.com/en/definition/catch-22 (last visited June 1, 2020) [https://perma.cc/A52N-HTMM]).

a defendant is granted leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proceedings.").

¶ 74        Reversed and remanded.

¶ 75        JUSTICE BURKE, dissenting:

¶ 76        I write separately because I disagree with the majority's conclusion that defendant satisfied the cause-and-prejudice test for filing a successive postconviction petition. The majority concludes that defendant satisfied the cause element because he could not have raised the argument concerning his sentence before the United States Supreme Court's decision in *Miller* and the cases that followed. However, *Miller* provides sentencing protections only for offenders who were juveniles at the time of their offense. Defendant was not a juvenile at the time of the offense. As a result, defendant cannot show prejudice because he was never entitled to the protections afforded to a juvenile. The cases cited by the majority expanding *Miller* protections to young adults are outliers with either extraordinary factual circumstances or flawed reasoning, and they should not be followed in this case. As such, I would find that defendant is not entitled to seek relief under *Miller* and its progeny, and I would affirm the circuit court's denial of leave to file. Accordingly, for the reasons stated below, I must respectfully dissent.

¶ 77                                A. Evidence at Trial

¶ 78        The majority sets forth the factual record at length; however, I feel it is important to highlight the evidence concerning the injuries defendant inflicted on Jerome Jr., his six-month-old son. Based on the testimony of defendant's girlfriend, Katherine, and her friend, Karen, defendant scratched, bit, burned, and struck the baby before eventually beating him so severely that Jerome Jr. suffered brain hemorrhaging, which led to his death. The testimony of the doctor who performed the autopsy, Dr. Kirschner, is particularly disturbing, detailing the numerous injuries to the infant. Jerome Jr.'s neck and shoulders were covered with abrasions, including bite marks. He was badly bruised on his face, head, and buttocks, and he had been burned by a hot circular object or a lightbulb. Some of these wounds were days old, indicating that defendant's abuse of the child extended well before the night in question where defendant struck Jerome Jr. with "a lot of *** violent force" causing him to suffer fatal brain hemorrhaging.

¶ 79        The evidence adduced at trial also showed defendant's awareness that his actions were wrong. Rather than tell Katherine about what he had done to the baby, he allowed her to continue caring for him as though he had not been abusing him. When defendant learned that an ambulance was coming for Jerome Jr., rather than admit his fault, he told Katherine that they should think of someone else to blame for the baby's death. He then lied to police officers and told them that Katherine had been responsible for shaking the baby and causing his death. He even attempted to blame Katherine for the burns on the baby, saying that she held him against a light after shaking him. After admitting to the officers that he was the one who shook the baby, he then started trying to fabricate a mental illness defense. As the majority sets out at length, two psychiatrists and a psychologist found defendant fit to stand trial. The majority attempts to cast doubt on the expert testimony of the three State experts by pointing out that they were all employed by the forensic clinical services of the circuit court of Cook County

but ignores that the defense expert psychologist, Dr. Michael Stone, has testified in nearly a dozen cases that have reached this court, each time on behalf of the defendant in support of an insanity defense. See, *e.g.*, *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 7; *People v. Dresher*, 364 Ill. App. 3d 847, 853-54 (2006); *People v. Smith*, 2016 IL App (1st) 141442-U, ¶¶ 23-25.

¶ 80    Defendant has also filed a direct appeal, four *pro se* postconviction petitions, and three *pro se* section 2-1401 petitions. The current petition thus represents defendant's ninth postconviction challenge to his conviction and sentence.

¶ 81                                ANALYSIS
¶ 82                          A. Cause and Prejudice
¶ 83    As the majority sets forth, in order for defendant to file this successive petition under the Act, he must first satisfy the cause-and-prejudice test. Defendant maintains that he satisfied the cause element of the cause-and-prejudice test because he could not have filed his petition before the Supreme Court announced the new juvenile sentencing rules in *Miller*, which this court then extended to young adults in *People v. House*, 2015 IL App (1st) 110580 (*House I*), and reaffirmed in *People v. House*, 2019 IL App (1st) 110580-B (*House II*), *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020). Defendant asserts that he established prejudice because the sentencing court could not have considered the *Miller* factors or the emerging science concerning brain development in young adults in determining his sentence. He contends that his sentence of life imprisonment without the possibility of parole therefore violates the eighth amendment and the proportionate penalties clause where the sentencing court failed to consider his youth and its attendant circumstances before sentencing him to a term of life imprisonment without the possibility of parole.

¶ 84                          B. Eighth Amendment
¶ 85    I will first address defendant's claims in the context of the eighth amendment. The majority briefly discusses defendant's claims under the eighth amendment before quickly jumping into its proportionate penalties clause analysis, noting, without resolving, that both federal courts and Illinois courts have drawn the line for *Miller* protections at 18 years old under the eighth amendment. Defendant, however, asserts that his sentence should be vacated under the eighth amendment because the bar on discretionary life sentences for juveniles established by the *Miller* line of cases should be extended to him because he was only 18 years old at the time of the offense. He argues that recent decisions of this court and the supreme court have cast doubt on the arbitrary line of demarcation between offenders under the age of 18 years old and those who are barely over it and recognize that an 18-year-old may have a cognizable *Miller*-based claim to be raised under the Act.

¶ 86    I find defendant's eighth amendment challenge unpersuasive. As the supreme court recognized in *People v. Harris*, "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *People v. Harris*, 2018 IL 121932, ¶ 61 (collecting authorities). The court continued that "[w]e agree with those decisions and our appellate court that, for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *Id.* Consistent with that ruling, this court has routinely held that *Miller*'s eighth amendment protections extend only to juvenile offenders under the age of 18. See, *e.g.*, *People v. Handy*, 2019 IL App (1st) 170213, ¶ 37 (collecting authorities); *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 47 ("*Miller* simply does not apply to a sentence imposed on one who

- 13 -

was at least 18 at the time of his offense. Thus, defendant did not show that prejudice resulted from the omission of the eighth-amendment claim from his initial petition under the Act."); *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 31 ("*Miller* protections under the eighth amendment are not implicated in cases of adult offenders"); *People v. Thomas*, 2017 IL App (1st) 142557, ¶ 28 (sentence for 18-year-old defendant "that approaches the span of the defendant's lifetime" does not implicate the eighth amendment).

¶ 87   Although defendant argues that the distinction between juvenile offenders and young adult offenders is arbitrary, as this court noted in *People v. Herring*, 2018 IL App (1st) 152067, ¶ 103, the United States Supreme Court "drew a line at the age of 18 years; while it acknowledged that the line was arbitrary, it 'must be drawn' " (quoting *Roper v. Simmons*, 543 U.S. 551, 574 (2005)). The Supreme Court explained in *Roper*,

> "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity that some adults will never reach. For the reasons we have discussed, however, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood." *Roper*, 543 U.S. at 574.

Accordingly, because defendant was an adult at the time he committed the offense, he is not afforded the same protections as a juvenile under *Miller* and related cases, and therefore, I would find defendant failed to satisfy the cause-and-prejudice test with regard to his eighth amendment claim.

¶ 88                                          C. Proportionate Penalties

¶ 89   Defendant next contends, and the majority agrees, that he showed cause and prejudice under the proportionate penalties clause of the Illinois Constitution. The majority concludes that the proportionate penalties clause provides greater *Miller*-based sentencing protections for young adults than the eighth amendment. This conclusion stands in contrast to the numerous cases from other authors and divisions of this court drawing the exact opposite conclusion. See, *e.g.*, *People v. Moore*, 2020 IL App (4th) 190528, ¶¶ 38-41; *People v. Green*, 2020 IL App (5th) 170462, ¶¶ 37-41; *People v. White*, 2020 IL App (5th) 170345, ¶¶ 27-31; *Handy*, 2019 IL App (1st) 170213, ¶ 40. The majority then discusses various aspects of Illinois law where offenders under the age of 21 are treated differently than older offenders. The majority points out recent decisions of the Illinois General Assembly concerning parole for offenders under the age of 21 who commit first degree murder. However, as the majority notes, the provisions of that statute do not apply retroactively. The majority then lists a number of instances where people under the age of 21 are treated differently by the law, *e.g.*, cigarette sales, alcohol sales, but none of these examples seem particularly relevant to a case where an 18-year-old was found guilty of the first degree murder of his six-month-old son after significant abuse. The majority then goes on to discuss defendant's mental health, noting that defendant's mental illness may be a mitigating factor at sentencing. The majority again focuses on Dr. Stone's testimony but ignores that one of the State experts found that defendant was malingering and that all three State experts found defendant fit to stand trial and not legally insane at the time of the offense. As the majority notes, defendant's mental health was discussed at length at his trial and there is ample evidence from which the trial court considered

- 14 -

defendant's mental health in determining his sentence. See *People v. McClurkin*, 2020 IL App (1st) 171274, ¶ 22.

¶ 90　　Defendant, for his part, relies on two recent appellate court decisions in support of his proportionate penalties claim, *House II*[6] and *People v. Williams*, 2018 IL App (1st) 151373, *judgment vacated*, No. 123694 (Ill. Nov. 28, 2018) (supervisory order). Defendant asserts that these cases not only provide greater *Miller* protections under the proportionate penalties clause than those afforded by the eighth amendment but also expand *Miller* and related cases so that young adult offenders receive the same protections as juvenile offenders.

¶ 91　　With regard to defendant's reliance on *Williams*, I note that opinion was vacated on January 2, 2019, after the supreme court issued a supervisory order directing this court to consider the effect of the supreme court's opinion in *Harris*, 2018 IL 121932, on the issue of whether defendant's sentence violated the proportionate penalties clause. On remand, the matter was set for supplemental briefing and later resolved on summary disposition by agreed order without an opinion. Accordingly, I find no precedential value in *Williams*.

¶ 92　　With regard to *House II*, I find the narrow circumstances of that case are not applicable here. In *House II*, the 19-year-old defendant acted as the lookout while other members of his gang executed two victims for selling drugs in their territory. *House II*, 2019 IL App (1st) 110580-B, ¶¶ 5, 14, 17. The defendant was convicted of two counts of first degree murder, then sentenced to two consecutive mandatory life sentences. *Id.* ¶ 19. The defendant filed a direct appeal and a petition under the Act. *Id.* ¶¶ 20-21. In his postconviction petition, the defendant contended, *inter alia*, that the imposition of a mandatory life sentence was unconstitutional. *Id.* ¶ 23. The circuit court dismissed defendant's petition, and defendant appealed that ruling to this court. *Id.* ¶¶ 23-24.

¶ 93　　On appeal, this court determined that defendant was entitled to a new sentencing hearing under *Miller*. *Id.* ¶ 32. The court distinguished the supreme court's ruling in *Harris*, 2018 IL 121932, by noting that the defendant in that case was the "actual shooter," while defendant House was convicted under a theory of accountability. *House II*, 2019 IL App (1st) 110580-B, ¶ 32. The *House II* court explained that "defendant's conviction under the theory of accountability weighed heavily in our conclusion that his mandatory natural life sentence shocked the moral conscience of the community." *Id.* The court "question[ed] the propriety of a mandatory natural life sentence for a 19-year-old defendant convicted under a theory of accountability." *Id.* ¶ 46. The court noted that defendant received the same sentence as the offenders who actually shot the victims. *Id.* The court also discussed developing science showing the continuing brain development in adolescents. *Id.* ¶ 47. Ultimately, the court concluded that, in light of the circumstances, the defendant was entitled to a new sentencing hearing during which the trial court could consider the relevant mitigating factors outlined in *Miller* and related cases prior to determining his life sentence. *Id.* ¶ 65.

¶ 94　　I find the reasoning in *House II* distinguishable from the facts of this case in several respects. As noted, the fact that the defendant in *House II* acted only as a lookout "weighed heavily" in the court's conclusion. *Id.* ¶ 32. Here, in contrast, defendant acted alone and was solely responsible for the burning, scratching, biting, and beating death of his six-month-old

---

[6]Defendant relied on a previous version of *House* in his postconviction petition. However, the *House* court reaffirmed its decision in *House II* following the vacation of *House I* based on a supreme court supervisory order following the supreme court's decision in *Harris*, 2018 IL 121932.

son. As this court noted in *Handy*, "[w]hether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause." *Handy*, 2019 IL App (1st) 170213, ¶ 40 (citing *Pittman*, 2018 IL App (1st) 152030, ¶ 38). Another significant factor for the court in *House II* was that the defendant's sentence was mandatory. The court observed that the sentencing court's "ability to take any factors into consideration was negated by the mandatory nature of defendant's sentence." *House II*, 2019 IL App (1st) 110580-B, ¶ 64. The *House II* court noted that these mitigating factors included defendant's age, family background, the fact that he was only the lookout, his lack of prior violent convictions, and his rehabilitative potential. *Id.* Here, defendant's sentence was discretionary, which allowed the court to consider the factors identified by the court in *House II*. Indeed, the record shows that at his sentencing hearing, defendant presented a presentence investigation report and a "Client Specific Sentencing Report." The person who prepared the "Client Specific Sentencing Report" testified at length at the sentencing hearing describing all of the factors he considered in preparing the report, including defendant's age, familial, educational, and criminal background, and defendant's potential for rehabilitation. In exercising its discretion to determine defendant's sentence, the court noted that it considered all of the factors presented in mitigation. Accordingly, "[b]ecause defendant was an adult, an active participant in the crime[ ], and received a discretionary sentence, he is not entitled to a new hearing for a more in-depth consideration of his youth under [*House II*]." *Handy*, 2019 IL App (1st) 170213, ¶ 41.

¶ 95  Finally, I note that two recent decisions from another division of this court followed this court's ruling in *House II* and disagreed with the distinguishing factors—the defendant's level of participation in the offense and whether the sentence was discretionary or mandatory—identified in *Handy*. See *People v. Ruiz*, 2020 IL App (1st) 163145; *People v. Johnson*, 2020 IL App (1st) 171362. I find that *Ruiz* and *Johnson* stand against the weight of the authority on this issue and would decline to follow them. See, *e.g.*, *White*, 2020 IL App (5th) 170345, ¶¶ 27-28 (distinguishing the ruling in *House II* on the basis that the defendant was the principal and not convicted under a theory of accountability); *People v. Ramsey*, 2019 IL App (3d) 160759, ¶ 23 (same); *Handy*, 2019 IL App (1st) 170213, ¶¶ 40-41 (distinguishing the ruling in *House II* on the basis that the defendant was the principal, not convicted under a theory of accountability, and his sentence was discretionary); see also *Pittman*, 2018 IL App (1st) 152030, ¶¶ 37-38 (distinguishing the ruling in *House I* on the basis that the defendant was the principal and not convicted under a theory of accountability); *Thomas*, 2017 IL App (1st) 142557, ¶ 34 (same); *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 27 (same).

¶ 96  Accordingly, I would find that because the sentencing guidelines of *Miller* are not extended to adult offenders under the proportionate penalties clause, defendant has failed to establish the necessary cause and prejudice for the filing of a successive postconviction petition and the circuit court properly denied him leave to file his successive petition.

¶ 97                                    CONCLUSION

¶ 98  For the reasons stated, I would affirm the judgment of the circuit court of Cook County.