2020 IL App (1st) 181883-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
November 17, 2020

No. 1-18-1883

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11-CR-12410 |
| | ) | |
| DEVIN A. BICKHAM, JR., | ) | The Honorable |
| | ) | Geary W. Kull, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Pucinski concurred in the judgment.
Justice Lavin dissented.

**ORDER**

¶ 1    *Held:* First-stage summary dismissal of petitioner's *pro se* petition for postconviction relief is reversed and remanded, where his claim that the 50-year sentence imposed for offense he committed at age 20 violated the proportionate penalties clause of the Illinois Constitution is not frivolous or patently without merit under current law.

¶ 2    Petitioner Devin A. Bickham, Jr., was convicted in a jury trial of two counts of first degree murder and is serving a sentence of 50 years in prison. He appeals from the trial court's first-stage summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act. 725 ILCS 5/122-1 *et seq.* (West 2018). He contends that the trial court erred in dismissing his petition

because it presented arguable claims that: (1) his 50-year sentence, imposed for an offense he committed when he was 20 years old, was a *de facto* life sentence imposed in violation of the proportionate penalties clause of the Illinois constitution, as applied to him (Ill. Const. 1970, art. I, § 11); and (2) because his trial counsel did not move to suppress the inculpatory statements he made to police without knowingly and intelligently waiving his *Miranda* rights, he was denied his constitutional right to effective assistance of counsel. As we agree with his first contention, we reverse and remand for second-stage postconviction proceedings.

¶ 3                                                    II. BACKGROUND

¶ 4        In this court's decision on petitioner's direct appeal, we set forth in detail the facts of petitioner's trial and sentencing hearing. *People v. Bickham*, 2017 IL App (1st) 142894-U. As the trial evidence is not at issue, we summarize only those facts necessary to an understanding of the issues raised in this appeal.

¶ 5        In July 2014, a Cook County jury convicted petitioner of two counts of first degree murder. In doing so, it made a finding that the murder was committed pursuant to a contract, agreement, or understanding to receive money or something of value in return for committing it, or that another person was procured to commit the murder for money or something of value ("contract murder" factor). The convictions arose out of events that occurred on July 11, 2011, in the parking lot of a park in River Forest, Illinois. The victim, Chevron Alexander, was shot once in the face and three times in the shoulder while sitting in a parked car. Petitioner's co-defendant, Devin Bickham, Sr., who is petitioner's father, was also convicted in a simultaneous but severed jury trial with petitioner. A third codefendant, Cardell Taylor, was tried separately and also convicted.

¶ 6        Prior to trial, petitioner's counsel retained a psychologist, Dr. Eric Ostrov, to conduct a psychological evaluation of petitioner. In a written report, he noted that petitioner's childhood

centered on his relationship with his father and his father's unstable relationships with a series of women, and that petitioner had attempted to have a close relationship with his father while realizing that he was continually betraying the women in his life. He noted that psychological testing had shown that petitioner was angry, depressed, impulsive, and emotionally vulnerable, and that he showed suicidal tendencies to a slight extent. He noted that petitioner's intelligence testing showed he had an IQ of 84, and his low intelligence added to his inability as a child to cope with his confusing family situation and "made him particularly susceptible to going along with and facilitating his father's plan to kill his girlfriend." He expressed the opinion that petitioner urgently needed psychotherapy and would benefit from psychotropic medication.

¶ 7     At the trial, petitioner's theory of defense was that his father had manipulated him into helping commit the murder because he knew petitioner would do whatever he asked of him. The State's evidence at trial showed that the victim was pregnant and engaged to be married to petitioner's father the following month. However, petitioner's father was already married. On the evening at issue, petitioner's father had played cards with the victim and her mother. Petitioner's father was sending text messages on his cell phone whenever the victim would leave the table. At about 10:00 p.m., the victim left with petitioner's father in his car. Two witnesses testified that at about 10:15 p.m., they were in a park near Harlem Avenue and Division Street when they heard three popping noises and saw a man running away from the park's parking lot. A different man began yelling that his girlfriend had been shot, and one of the witnesses called 911.

¶ 8     Officer Anthony Pluto of the River Forest Police Department went to the park in response to the call. Petitioner's father told him that his girlfriend had been shot. The front passenger-side window of the car was shattered, and the victim was slumped over in the seat next to it, bleeding. Petitioner's father described the shooter as a black male wearing a white shirt who had fled east

on Division Street in a gray car. Officer Pluto broadcast that information, and shortly thereafter a car matching that description was stopped by another officer. Officer Pluto took petitioner's father for a show-up, where petitioner and Taylor were standing behind petitioner's silver Chevrolet Impala. Officer Pluto asked petitioner's father if either of these men were the shooter, and he responded that they did not look at all like the assailants. As Officer Pluto was about to go speak with the other officers, petitioner's father said to him that one of the men was his son. A pistol was also recovered from underneath the driver's seat of the car. It was later shown that this gun had been given to petitioner's father as a wedding gift years earlier. Physical evidence showed that the three bullets inside the victim and one bullet inside petitioner's father's car matched the caliber of and had been fired from the pistol found in petitioner's car.

¶ 9        Officer Dan Miller testified that he and another officer had stopped the Impala after realizing it matched the description of a wanted vehicle and ordered the driver and passenger to exit. Officer Miller's partner had seen a gun inside the vehicle. Petitioner stated that he had been driving when a black male threw the gun into his lap. As he moved petitioner and Taylor into position for the show-up, he overheard Taylor tell petitioner that he wanted his money now.

¶ 10        Cell phone evidence was presented that at 8:49 p.m. that night, petitioner had sent a text to Taylor stating, "Dey N the crib." At 9:42 p.m., petitioner's father sent petitioner a text stating, "We goin 2 da park." Petitioner texted back, "I'm out here. What park." Petitioner's father answered that he did not know. At 9:44 p.m., petitioner's father sent him a text asking, "How close." Petitioner texted back, "Passing Central," and then "on Lake." At 10:05 p.m., petitioner's father made a phone call to petitioner that lasted 17 seconds. At 10:08 p.m., petitioner placed a call to his father lasting 33 seconds. At 10:19 p.m., petitioner's father called 911 and then called the victim's house.

¶ 11    Two videotaped interviews of petitioner by police were published to the jury. These interviews occurred on July 12, 2011. In the first, petitioner essentially denied involvement in the murder. He stated he accidentally ended up at Harlem and Division when a man threw a gun into his car. He eventually stated that he and Taylor had ended up near the park when Taylor told him to stop the car. Taylor then got out, petitioner heard three gunshots, Taylor ran back to the car, and, knowing "what was up," petitioner sped away. In the second interview, petitioner confessed to his role in the murder. He stated that his father had asked him if he knew of someone who would kill the victim for him, because he wanted to end their relationship. Accordingly, in April or May 2011, petitioner put his father in touch with Taylor. Petitioner's father agreed to pay money to Taylor for the murder, and, although petitioner was unsure of the amount of money Taylor was to receive from petitioner's father, Taylor was going to give petitioner $100 for driving him to the scene. In late May 2011, petitioner's father gave petitioner money and a gun to give to Taylor, which petitioner did. On the night at issue, petitioner stated he had called his father, who told him he was going to a park. Petitioner's father was at a store on Division Street, and petitioner drove there with Taylor, waited for him, and then followed him to the park. Petitioner stated that he knew that the murder was going to happen that night.

¶ 12    At the close of evidence, the jury found petitioner guilty of first degree murder and that the contract murder factor had been proven.

¶ 13    The cause then proceeded to the sentencing hearing. There, petitioner's maternal aunt read a letter to the court explaining that she had witnessed the ways in which petitioner had been a victim of his father's manipulation since he was a young boy. His father had used him as a "24 hour baby-sitter" and would make him work until midnight on school nights when he was as young as 13 or 14 years old. She stated that petitioner had no friends his own age, and his entire world was his

father. She stated he was "good kid" who was in school, had never been arrested, and would take his grandmother to the doctor and grocery shopping. She stated that petitioner never would have done anything like this if not for his father's manipulation of him.

¶ 14    Petitioner's mother testified that petitioner had lived with his father since he was about five years old. She testified that he had gone to school, and he never got into trouble or fights at school. She testified that since petitioner was young, his father would use him to get out of the house and away from his then-wife. She testified that there had been times when petitioner would call her about something his father was trying to manipulate him to do that he did not want to do, and she would then step in to get him away from his father.

¶ 15    In aggravation, the prosecutor argued that because the contract factor of first degree murder had been proven in this case and because a firearm had been used by the codefendants, the petitioner faced a sentence of between 20 to 35 years minimum and 80 to 95 years maximum. She stated that the State was not asking for the maximum sentence for petitioner, but there were aggravating factors that warranted more than a minimum sentence. She argued that when he committed this offense at 20 years old, he was "[y]es, young, but not 16, 17 years old." She pointed out that he had graduated from high school and attended community college. He had no prior arrest or history of getting into fights or trouble. However, at age 20 he made a choice to participate in a contract murder and drive the shooter to the scene to commit an execution-style murder.

¶ 16    In mitigation, petitioner's attorney argued that petitioner should be given the minimum sentence. He tendered Dr. Ostrov's pretrial written report and highlighted portions of it, including the fact that petitioner had a low IQ of 84, a high level of emotional distress, identity confusion, and difficulty thinking clearly, and he had suffered from suicidal tendencies. His attorney argued that he had a "broken brain" and lacked the mental capacity to understand the legal concept of

accountability. He argued that petitioner's "manipulative cold-blooded father [was] able to use that low IQ[,] that disconnect that he has; that life-long of training that women and people don't matter, and combined it to get him to do his dirty work." In allocution, petitioner stated to the victim's family that he was sorry for their loss.

¶ 17    The trial court sentenced petitioner to 50 years in prison. The court stated that petitioner's father had been the worst of the three participants in the murder, and that his manipulation of petitioner was clear. The court also found that, apart from his father, petitioner appeared to have come from a decent home of loving and caring people. The court also noted that petitioner had no history of problems with gangs, drugs, alcohol, or crime, and that he had gotten an education and had completed a year of college. However, the court explicitly found that defendant knew the difference between right and wrong, had planned the crime, and knew the intent of his actions was to end another human being's life. Additionally, significant time had passed between the planning and the murder, during which petitioner could have decided not to participate. The court noted that he had called his mother in the past when his father attempted to make him do something he did not want to, and he could have done the same thing in this situation. Thus, the trial court determined that, while he did not deserve the maximum sentence, he did not deserve the minimum sentence because had chosen not to act to stop the crime despite having opportunities to do so.

¶ 18    On direct appeal, this court accepted petitioner's argument that one of his two murder convictions must be vacated under the one-act, one crime doctrine. *Bickham*, 2017 IL App (1st) 142894-U, ¶¶ 61-65. This court rejected defendant's contention that the trial court had abused its discretion in denying his pretrial motion for a continuance to obtain an examination concerning his fitness to stand trial. *Id.* ¶¶ 25-48. This court also rejected petitioner's argument that the trial court had abused its discretion in sentencing him to 50 years by failing to consider the mitigating

factors of his "chaotic childhood," psychological impairments, lack of criminal background, his youth and rehabilitative potential, his remorse, and the cost of his incarceration. *Id.* ¶¶ 49-60. In doing so, this court rejected his specific argument that "his youth made him 'most susceptible' to his father's influence but was not indicative of 'irretrievable depravity,' as he otherwise was educated, had a good character and supportive family, and already proved himself to be a model prisoner." *Id.* ¶ 58. The Illinois Supreme Court denied his petition for leave to appeal. *People v. Bickham*, No. 122174, 89 N.E.3d 757 (Table), 417 Ill. Dec. 838 (Ill. Sept. 27, 2017). The United States Supreme Court also denied his petition for writ of certiorari. *Bickham v. Illinois*, No. 17-8581, 138 S. Ct. 2683 (Mem.) (Jun. 25, 2018).

¶ 19    On March 19, 2018, petitioner filed the instant petition for postconviction relief, alleging that his constitutional rights had been violated in his trial and sentencing. His petition raised multiple claims. One of those was that he did not knowingly and intelligently waive his *Miranda* rights where his IQ was only 84 and he could not read and fully comprehend the typed *Miranda* warnings given to him by police, yet his counsel failed to file a pretrial motion to suppress his statement on that basis. Another claim in his petition was that, at the time of his offense, he had been only 20 years old, had "suffered a lifetime of mental manipulation by his father," had "many psychological disorders" for which he had never obtained treatment, and had a below-average IQ of 84. His petition stated that his 50 year sentence "is effectively a life sentence." Among the cases he cited in support of his claim were *Miller v. Alabama*, 567 U.S. 460 (2012), and this court's original decision in *People v. House*, 2015 IL App (1st) 110580, *vacated and remanded*, No. 122134, 111 N.E.3d 740 (Table), 425 Ill. Dec. 132 (Ill. Nov. 28, 2018). His petition stated that in *House*, although the defendant had been a 19-year-old adult, the court had found his "youthfulness [was] relevant when considered alongside his participation in the actual shootings" and that his natural

life sentence violated the proportionate penalties clause as applied to him.

¶ 20     The trial court summarily dismissed petitioner's postconviction petition and did not advance it to the second stage. In an oral ruling, the court stated that it had determined that all of the issues petitioner had raised in the petition were either *res judicata* of his direct appeal or were frivolous and patently without merit. This court allowed petitioner's late notice of appeal.

¶ 21                                    II. ANALYSIS

¶ 22                              A. Standard of Review

¶ 23     Petitioner argues that the trial court erred in its first-stage, summary dismissal of his postconviction petition because he set forth a nonfrivolous, arguable claim that his constitutional rights were violated in the proceedings below. The Post-Conviction Hearing Act (725 ILCS 5/122-1(a)(1) (West 2018)) permits a person under criminal sentence to challenge his conviction or sentence by showing that, in the proceedings which resulted in his conviction, there was a substantial denial of his constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding is a collateral attack on a prior conviction that is limited to constitutional matters that were not and could not have been previously adjudicated. *People v. Morris*, 236 Ill. 2d 345, 354 (2010). The action is commenced by the filing of a petition in the circuit court where the original proceeding occurred. *People v. Tate*, 2012 IL 112214, ¶ 8.

¶ 24     A postconviction proceeding involves three stages. *People v. Johnson*, 2018 IL 122227, ¶ 14. This case is at the first stage, in which the trial court independently reviews the petition without input from the State. *Id.* This stage involves no hearings, arguments, or introduction of evidence. *Id.* ¶ 21. Rather, the trial court reviews the petition to determine whether it "is frivolous or is patently without merit," and the trial court must summarily dismiss that petition if it determines that it meets that standard. 725 ILCS 5/122-2.1(a)(2) (West 2018); see *Tate*, 2012 IL 112214, ¶ 9.

A petition should be summarily dismissed under this standard "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 11-12. "A petition lacks an arguable basis in law when it is grounded in 'an indisputably meritless legal theory,' for example, a legal theory which is completely contradicted by the record." *Morris*, 236 Ill. 2d at 354 (quoting *Hodges*, 234 Ill. 2d at 16). "A petition lacks an arguable basis in fact when it is based on a 'fanciful factual allegation,' which includes allegations that are 'fantastic or delusional' or belied by the record." *Id.* (quoting *Hodges*, 234 Ill. 2d at 16-17). Further, a petition alleging nonfactual and nonspecific assertions that merely amount to conclusions will not survive summary dismissal. *Id.*

¶ 25    In evaluating a petition at the first stage, the trial court must take the allegations as true and construe them liberally. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). Thus, although the petition must provide some facts about the constitutional deprivation alleged, a limited amount of factual detail is sufficient. *Id.* The threshold for a petition to survive the first stage of review is low. *People v. Allen*, 2015 IL 113135, ¶ 24. It a petition alleges sufficient facts to state he gist of a constitutional claim, even if it lacks legal argument or citations to authority, first-stage dismissal is inappropriate. *Id.* In considering the petition, the trial court may examine the court file of the proceeding that resulted in the conviction, any transcripts of that proceeding, and any action taken by an appellate court in that proceeding. 725 ILCS 5/122-2.1(c) (West 2018). The summary dismissal of a postconviction petition is reviewed *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 26    A petition that is not subject to summary dismissal advances to the second stage of a postconviction action, where counsel may be appointed for an indigent defendant and where the State may answer or move to dismiss the petition. *Id.*; see 725 ILCS 5/122-4, 122-5 (West 2018). If a postconviction petition is comprised of multiple claims and one of them survives the summary dismissal stage, the entire petition is docketed for second-stage proceedings regardless of the

merits of the other claims. *People v. Romero*, 2015 IL App (1st) 140205, ¶ 27 (citing *People v. Rivera*, 198 Ill. 2d 364, 371 (2001)). At the second stage, the trial court must determine whether the petition and any accompanying documentation make "a substantial showing of a constitutional violation." *Tate*, 2012 IL 112214, ¶ 10 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). If no such showing is made, the petition is dismissed. *Id.* If such a showing is made, the petition is advanced to the third stage, at which the trial court conducts an evidentiary hearing. *Id.*; 725 ILCS 5/122-6 (West 2018).

¶ 27                     B. Proportionate Penalties Clause Violation in Sentencing

¶ 28        Petitioner's first argument is that his petition presented an arguable claim that his 50-year sentence was a *de facto* life sentence imposed in violation of the proportionate penalties clause of the Illinois constitution, as applied to him, where he was only 20 years old at the time of the offense for which he was found legally accountable. That clause provides, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Relevant to this case, " 'a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community.' " *People v. Coty*, 2020 IL 123972, ¶ 31 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 130 (2004)). This clause provides a limitation on penalties beyond those afforded by the eighth amendment of the United States Constitution. *People v. Clemons*, 2012 IL 107821, ¶ 39.

¶ 29        Petitioner contends that research in neuroscience and psychology has evolved in recent years to show that the brain of a young adult continues to mature into a person's early twenties, in the parts of the brain governing impulsivity, judgment, planning for the future, foresight of consequences, and similar characteristics that affect a person's criminal culpability. He argues that

Illinois courts have recognized that these scientific developments in the brains of young adults may warrant extending to them the same procedural protections in sentencing that are applicable to juvenile offenders based on similar science. See, *e.g.*, *People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 55-56, *appeal allowed*, No. 125124, 140 N.E.3d 231 (Table), 435 Ill. Dec. 673 (Ill. Jan. 29, 2020). He contends that he has raised an arguable claim that this science applies to him and that he should be allowed to develop a record in second-stage proceedings to show that his 50-year sentence was imposed without sufficient consideration of the effect of his youth on his brain and his potential for rehabilitation, and that this violated the proportionate penalties clause as applied to him.

¶ 30    To place petitioner's argument in context, we briefly trace the development of the law beginning with the United States Supreme Court's decision in *Miller*, which held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 U.S. at 465. The Court held that minors are constitutionally different than adults for sentencing purposes, being less mature and responsible, more impulsive, and more vulnerable to negative influences and peer pressure than adults, and not having the fully-formed character of adults so that their actions to not necessarily indicate irreversible depravity. *Id.* at 471-74. While opining that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," the Court stated that "we do not foreclose a sentencer's ability to make that judgment in homicide cases" but "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 479, 480, 489.

¶ 31    The Court later explained that its holding in *Miller* was that life imprisonment without parole is unconstitutional for "juvenile offenders whose crimes reflect the transient immaturity of youth,"

except for " ' "the rare juvenile offender whose crime reflects irreparable corruption." ' " *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016) (quoting *Miller*, 567 U.S. at 479-80 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005))). Thus, to separate those juveniles who may be sentenced to life without parole from those who may not, a hearing is required at which the sentencing court must "consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 734-35.

¶ 32    The Illinois Supreme Court has held that the sentencing protections of *Miller* apply not only to actual sentences of mandatory life imprisonment without parole, but also to *de facto* life sentences imposed on juvenile offenders. *People v. Reyes*, 2016 IL 119271, ¶ 9. It has further held that a sentence imposed on a juvenile offender will not constitute a *de facto* life sentence in violation of the eighth amendment if the sentence is 40 years or less. *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Additionally, it has held that the protections of *Miller* extend to discretionary sentences of life without parole for juveniles, as such sentences are "disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *People v. Holman*, 2017 IL 120655, ¶ 40. Thus, a juvenile offender may be sentenced to life imprisonment without parole only if the trial court determines that the juvenile offender's conduct showed "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* at ¶ 46. The trial court may make such a determination only if it first considers the juvenile offender's youth and its attendant characteristics, which include but are not limited to: (1) the juvenile offender's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile offender's family and home environment; (3) the juvenile offender's degree of participation in the homicide and any evidence of familial or peer pressures

that may have affected him; (4) the juvenile offender's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile offender's prospects for rehabilitation. *Id.* (citing *Miller*, 567 U.S. at 477-78).

¶ 33   The supreme court later summarized these principles in *Buffer*: "Therefore, to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27 (citing *Holman*, 2017 IL 120655, ¶ 40; *Reyes*, 2016 IL 119271, ¶ 9).

¶ 34   The supreme court has twice been presented with the argument that the *Miller* protections extend to offenders who committed offenses after their eighteenth birthdays. In *People v. Thompson*, 2015 IL 118151, ¶ 39, it declined to allow a defendant who committed murders at age 19 to assert on appeal an as-applied eighth amendment challenge under *Miller* to his mandatory life sentence, because of the fact that the defendant had not asserted this claim in the trial court. In doing so, it stated that a successive postconviction petition was an avenue by which the defendant could attempt to assert his constitutional claim in the trial court, although it declined to express an opinion on the merits of such a claim. *Id.* ¶ 44.

¶ 35   In *People v. Harris*, 2018 IL 121932, ¶¶ 1, 22, the supreme court was confronted with a direct appeal by a defendant who had been 18 years and 3 months old at the time of the offenses giving rise to his convictions for first degree murder, attempted first degree murder, and aggravated battery with a firearm, and he argued that his mandatory aggregate sentence of 76 years violated the proportionate penalties clause and the eighth amendment as applied to him. The appellate court had held that the defendant's sentence violated the proportionate penalties clause, but the supreme

court reversed. *Id.* ¶¶ 34-48. It noted that the defendant was presenting an "as-applied" constitutional challenge to his sentence rather than a "facial" challenge (*id.* ¶¶ 37-39), but his failure to raise this challenge in the trial court meant that the trial court had neither held an evidentiary hearing nor made findings "on the critical facts needed to determine whether *Miller* applies to defendant as an adult." *Id.* ¶ 46. The supreme court noted that "the record here does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances." *Id.* Thus, the supreme court held that the defendant's as-applied challenge under the proportional penalties clause was premature. *Id.* ¶ 46. It further stated that the defendant's proportionate penalties claim was one that would be more appropriately raised in postconviction proceedings. *Id.* ¶ 48. While not foreclosing an as-applied challenge under the proportionate penalties clause, the supreme court did, however, however, reject the defendant's facial challenge to his sentence under the eighth amendment, recognizing the age of 18 marked the line separating juveniles and adults for purposes of the eighth amendment.[1] *Id.* ¶¶ 49-61.

¶ 36        In *House*, 2019 IL App (1st) 110580-B, ¶ 65, which was issued after the supreme court directed this court to reconsider its earlier 2015 opinion in light of *Harris*, this court, in review of the dismissal of a second-stage postconviction proceeding, held that a 19-year-old offender's mandatory life sentence was unconstitutional under the proportionate penalties clause as applied to him, vacated the sentence, and remanded the case for a new sentencing hearing. The court reasoned that, although the defendant was not a juvenile when he committed the offense, his young age of 19 was relevant under the circumstances of the case. *Id.* ¶ 46, 63. Also relevant were the

---

[1] We note that petitioner here does not make any argument that his sentence violates the eighth amendment of the United States Constitution. U.S. Const., amend. VIII.

facts that the defendant had served only as a lookout during the shooting at issue and had been found guilty of murder on a theory of accountability. *Id.* ¶ 46. He also received the same sentence of mandatory natural life in prison as the actual shooter, whereas another co-defendant with culpability similar to that of the defendant had already been released from prison because the co-defendant had been only 17 years old at the time of the offense. *Id.* The court further reasoned that the mandatory nature of the defendant's sentence had precluded the trial court from considering the goal of rehabilitation in imposing the sentence, which the court found especially relevant to the defendant's case. *Id.* ¶ 64. Given the defendant's young age, family background, actions of being only a lookout, and lack of prior violent convictions, the court held that the mandatory sentence of natural life "shocks the moral sense of the community." *Id.*

¶ 37     Since *House*, this court has issued decisions rejecting attempts by petitioners who were age 18 or older at the time of their offenses to file successive postconviction petitions raising as-applied challenges under the proportionate penalties clause, where the offenders had an active role in the offenses at issue, the sentences imposed on the offenders were discretionary, the offenders essentially received sentencing hearings in which their youth and rehabilitative potential were considered as mitigating factors, or their successive petitions failed to allege facts showing how their individual circumstances caused their brains to be more similar to those of juveniles than to mature adults. See, *e.g.*, *People v. Carrion*, 2020 IL App (1st) 171001, ¶¶ 30-33; *People v. Gomez*, 2020 IL App (1st) 173016, ¶¶ 37-38; *People v. McClurkin*, 2020 IL App (1st) 171274, ¶¶ 20-23; *People v. Handy*, 2019 IL App (1st) 170213, ¶¶ 40-41; *People v. Moore*, 2020 IL App (4th) 190528, ¶¶ 38-41; *People v. White*, 2020 IL App (5th) 170345, ¶¶ 31.

¶ 38     In other cases, however, this court and other districts of the appellate court have issued decisions reversing trial courts that summarily dismissed postconviction petitions at the first stage

or denied leave to file successive postconviction petitions, where offenders age 18 or older have raised claims that in light of recent developments in brain science, lengthy sentences imposed on them without consideration of their youth and rehabilitative potential violated the proportionate penalties clause as applied to them, regardless of the violent nature of the offense, the offender's level of involvement in it, the discretionary nature of the sentence, or what evidence was actually presented or considered at the sentencing hearing. See, *e.g.*, *People v. Savage*, 2020 IL App (1st) 173135, ¶ 76; *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 68-69; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 2, 34; *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 1, 38-40; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 1-2, 15-16; *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 47; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14. We note that several of these cases were issued over strong dissents. *Franklin*, 2020 IL App (1st) 171628, ¶¶ 75-98 (Burke, J. dissenting); *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 74-92 (Pierce, J. dissenting); *Johnson*, 2020 IL App (1st) 171362, ¶¶ 37-52 (Pierce, J. dissenting).

¶ 39    It is because of the cases set forth in the preceding paragraph that we are unable to conclude at this stage of petitioner's case that his claim that his sentence violates the proportionate penalties clause is indisputably meritless. Significantly, this case involves a first-stage summary dismissal, not a petition for leave to file a successive post-conviction petition. The "frivolous" or "patently without merit" standard applicable at this stage of a postconviction proceeding is a lower standard than the "cause and prejudice" test applicable in considering whether to the filing of a successive postconviction petition (*People v. Smith*, 2014 IL 115946, ¶ 35 (citing *People v. Edwards*, 2012 IL 111711, ¶¶ 26-27), and courts have held that claims very similar to petitioner's can satisfy the higher standard.

¶ 40　　　　For example, in *Minniefield*, this court held that the higher "cause and prejudice" standard was met to justify the filing of a successive postconviction petition by a petitioner who was 19 years old at the time of offense and alleged that his discretionary sentence of 50 years for first degree murder violated the proportionate penalties clause, as applied to him, "in light of the developing law that began with *Miller* and the developing science concerning young adults." *Minniefield*, 2020 IL App (1st) 170541, ¶¶ 24, 38-44. Significant to the court's decision was the fact that the Illinois General Assembly had, effective June 1, 2019, changed the law regarding parole review eligibility for offenders convicted of first degree murder who were under the age of 21 at the time of the offense. *Id.* ¶ 40. The new statute cited by the court provides in pertinent part:

> " 'A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date [of the new act]) shall be eligible for parole review *** after serving 20 years or more of his or her sentence or sentences.' " *Id.* (quoting Pub. Act. 101-288 (eff. Jan. 1, 2020)) (codified as 730 ILCS 5/5-4.5-115(b) (West Supp. 2019)).

Thus, the court reasoned, if the defendant had been sentenced at the time of the court's decision, he would be eligible for parole after 20 years, instead of the 50 years required by his sentence. *Id.* The court noted further that in other ways also, Illinois law considered individuals between the ages of 18 and 21 to be minors. *Id.* ¶ 41. It cited the Juvenile Court Act of 1987 as defining a minor as " 'a person under the age of 21 years subject to this Act.' " *Id.* (quoting 705 ILCS 405/1-3(10) (West 2018)). It noted that such an individual under age 21 could receive certain benefits, such as receiving a "station adjustment" following an arrest (which does not constitute an adjudication of delinquency or criminal conviction), a probation adjustment, or eligibility for community mediation programs. *Id.* (citing 705 ILCS 405/5-301, 5-305, 5-310 (West 2018)). It noted other

ways in which Illinois law treats individuals under the age of 21 differently, such as "prohibiting sales to them of alcohol (235 ILCS 5/6-16(a)(i) (West 2018)), cigarettes (Pub. Act 101-2, § 25 (eff. July 1, 2019) (amending 720 ILCS 675/1)), and wagering tickets (230 ILCS 10/18(b)(1) (West 2018)), requiring parental permission to legally own a firearm (430 ILCS 65/4(a)(2)(i) (West 2018)), and limiting Class X sentencing for recidivist offenders to those offenders 'over the age of 21 years.' (730 ILCS 5/5-4.5-95(b) (West 2018))." *Id.* ¶ 42. The court noted that the defendant had received a sentence that would have been considered a *de facto* life sentence without parole if he had been under the age of 18, and that a young adult offender could raise an as-applied challenge to a *de facto* life sentence in a postconviction proceeding. *Id.* ¶ 43 (citing, *e.g.*, *Harris*, 2018 IL 121932, ¶ 48). It noted also that, unlike in *Holman*, there had never been a finding of incorrigibility or psychological reports in the defendant's case. *Id.* ¶ 45 (citing *Holman*, 2017 IL 120655, ¶¶ 48, 50). Thus, the court reversed and allowed postconviction proceedings to permit the development of a record containing "evidence about the evolving science and its impact on defendant's case." *Id.* ¶ 47.

¶ 41        In *Savage*, this court reversed the first-stage summary dismissal of a postconviction petition by an offender who had been 22 years old at the time of the offense giving rise to the first degree murder and attempted first degree murder convictions, who argued that his 85-year sentence violated the proportionate penalties clause because the trial court failed to consider his drug addiction in conjunction with his young age. *Savage*, 2020 IL App (1st) 173135, ¶¶ 2-4. As in *Minniefield*, the court cited the ways in which Illinois law treats those under age 21 differently than those over that age, including the 2019 changes to parole review eligibility for young adults convicted of first degree murder. *Id.* ¶ 67-69. The court noted that although the defendant was over the age of 21 at the time of his offense, his argument that mental health issues lowered his

functional age to that of a juvenile had some support in the case law. *Id.* ¶ 70 (citing, *e.g.*, *House*, 2019 IL App (1st) 110580-B, ¶ 59). It noted that although the sentencing court had mentioned the defendant's young age, it had not considered "the attributes of young adulthood or these attributes in light of defendant's lifelong drug addiction." *Id.* ¶ 74. It also rejected the argument that the trial court's consideration of the defendant's presentencing investigation report meant that it had sufficiently considered the defendant's youth and its attendant circumstances. *Id.* ¶ 75. The court therefore concluded that, where the defendant's argument found support in both the filed record and recent case law, it could not be considered frivolous or patently without merit. *Id.* ¶ 76.

¶ 42    Based on these cases, we are unable to say at this stage that petitioner's claim under the proportionate penalties clause is frivolous or patently without merit. Petitioner was given a discretionary 50 year sentence that, if imposed on a juvenile offender, would have been considered a *de facto* life sentence. And it appears this sentence was imposed without a finding of his "irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. The argument that the proportionate penalties clause requires such a finding when imposing a *de facto* life sentence on a 20-year-old offender, in consideration of the offender's relative youth, is not "indisputably meritless" in light of the cases discussed above. See *Minniefield*, 2020 IL App (1st) 170541, ¶ 45. Also, as we noted on direct appeal, it is clear in this case that the trial court, in sentencing petitioner, did consider petitioner's relative youth and, specifically, his susceptibility to a lifetime of manipulation by his father. However, under the above precedent, we cannot find at this stage that the trial court's consideration of these factors renders petitioner's claim indisputably meritless, where these factors were not considered within the context of *Miller*'s requirements. See *Johnson*, 2020 IL App (1st) 171362, ¶¶ 19-25. Likewise, we cannot find at this first stage that petitioner's claim is rendered indisputably meritless by the fact that the sentence imposed on him

was discretionary or by his level of active participation in a violent, execution-style contract murder. See, *e.g.*, *Daniels*, 2020 IL App (1st) 171738, ¶ 31 (stating that neither *Harris* nor *House* suggested "that a defendant's degree of participation in a crime or discretionary sentence should utterly disqualify him or her from raising" an as-applied, youth-based proportionate penalties claim); *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 3, 38, 40 (noting that "*Miller* engages constitutional protections to young people who commit the most heinous type of offenses," including violent murders, and finding "no principled basis on which to distinguish *House* based on the level of a defendant's participation in the offense" or "on the ground that Ruiz's sentence was discretionary"). Accordingly, we conclude that petitioner's postconviction petition raises an arguable claim that his 50-year sentence was imposed in violation of the proportionate penalties clause of the Illinois constitution, as applied to him.

¶ 43     The State argues that we may nevertheless affirm the summary dismissal on the basis that the claim in his postconviction petition is *res judicata* of the claim he presented on direct appeal that the trial court abused its discretion in failing to consider his young age and rehabilitative potential as factors mitigating against his 50-year sentence. In his direct appeal, petitioner did not explicitly argue that his sentence was unconstitutional. However, he did cite *Miller* for the proposition that, because of his young age, his actions were not the product of "irretrievable depravity." He also cited this court's 2015 decision in *House* for the proposition that research had shown that "the brain doesn't finish developing until the mid-20's" and that young adults were more susceptible to peer-pressure, were less future-oriented, and were more volatile in emotionally charged settings. See *House*, 2015 IL App (1st) 110580, ¶ 95.

¶ 44     Trial courts may summarily dismiss postconviction petitions at the first stage where claims are *res judicata* of claims that were or could have been adjudicated on direct appeal. *People v.*

*Blair*, 215 Ill. 2d 427, 442-43 (2005). Claims clearly subject to the doctrines of *res judicata* or forfeiture meet the standard for dismissal of being "frivolous" or "patently without merit." *Id.* at 445. However, exceptions to the doctrines of *res judicata* and forfeiture exist, which may allow an otherwise barred claim to proceed. *Id.* at 450. For example, the doctrines of *res judicata* and forfeiture do not apply where fundamental fairness so requires or where facts relating to the claim do not appear on the face of the original appellate record. *Id.* at 450-451. Where a court finds, after initially reviewing a postconviction petition and the record of the earlier proceedings, that it is a close call whether a petition that sets forth the gist of constitutional claim is nevertheless barred by *res judicata* or forfeiture, or whether it is subject to an exception to one of these doctrines, the claim should not be dismissed as frivolous or patently without merit. *Id.* at 451. Rather, the court should advance the claim to the second stage to allow the appointment of an attorney to amend the petition, allow the State to file a motion to dismiss, and to garner the benefit of the adversarial process before determining whether the claim is subject to *res judicata* or forfeiture. *Id.*

¶ 45        Here, despite the similarity of the arguments presented on direct appeal and in the postconviction petition, we are unable to conclude at this stage that petitioner's as-applied claim under the proportionate penalties clause is definitively one that he could have raised in the proceedings below or one that does not qualify for any exceptions to a finding of *res judicata* or forfeiture. As discussed above, this area of the law has undergone substantial development since 2014 when petitioner was sentenced and 2016 when he filed his direct appeal, and such development may be a basis for applying the "fundamental fairness" exception to the doctrine of *res judicata*. See *People v. Sanders*, 393 Ill. App. 3d 152, 162 (2009). Further, the supreme court has suggested that a youth-based, as-applied proportionate penalties claim is "more appropriately raised" in postconviction proceedings than on direct appeal of a case in which the evidentiary

record was not adequately developed to address the constitutional issue. *Harris*, 2018 IL 121932, ¶ 48. Thus, we hold that petitioner's claim cannot be dismissed as *res judicata* at this first stage.

¶ 46    Beyond its ability to survive the first-stage dismissal standard under the case law as it currently stands, we express no further opinion as to the substantive merits of petitioner's claim. We reverse the trial court's summary dismissal of petitioner's petition and remand this case to the trial court for second stage proceedings.

¶ 47                      C. Ineffective Assistance of Counsel

¶ 48    As stated above, if a postconviction petition is comprised of multiple claims and one of them is sufficient to survive first-stage dismissal, the entire petition is docketed for second-stage proceedings regardless of the merits of the other claims. *Romero*, 2015 IL App (1st) 140205, ¶ 27 (citing *Rivera*, 198 Ill. 2d at 371). As such, based on our conclusion that petitioner's postconviction petition contains at least one claim that is not frivolous or patently without merit, his entire petition must be docketed for second-stage proceedings, and there is no need for us to separately consider his claim that he was denied his right to effective assistance of counsel.

¶ 49                      III. CONCLUSION

¶ 50    For the reasons set forth above, we reverse the trial court's summary dismissal of petitioner's *pro se* postconviction petition and remand this case for further proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-2.1(b) (West 2018)).

¶ 51    Reversed and remanded.

¶ 52    JUSTICE LAVIN, dissenting:

¶ 53    I would affirm the circuit court's judgment summarily dismissing defendant's first-stage postconviction petition because the claims are legally meritless and therefore frivolous and patently without merit. See *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009). As such, defendant's

proportionate penalties claim cannot serve as a basis to reverse and remand the case.

¶ 54    As set forth by the majority, the proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 55    Given this standard, defendant's 50-year discretionary sentence for the contract murder of his father's pregnant fiancé in no way shocked the moral sense of the community or was cruel or degrading. Defendant, who was legally an adult at age 20, knew about the plan to hire a hitman some three to four months in advance; in fact, it was defendant who actually placed his father in touch with the hitman, giving the hitman the murder weapon and money. Defendant himself was promised $100 for the murderous enterprise and drove the hitman to the scene of the murder after coordinating text messages with his father. While not the triggerman, defendant was an integral participant in the murder. *Cf. People v. House*, 2019 IL App (1st) 110580-B, ¶ 32, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020) (finding the 19-year-old defendant's mandatory life sentence for murder via accountability, where he acted only as a lookout and had no criminal background, shocked the moral conscience of the community and therefore violated the proportionate penalties clause). In that sense, defendant's sentence adequately represents his personal culpability. See *House*, 2019 IL App (1st) 110580-B, ¶ 46.

¶ 56    Moreover, even assuming *Miller* principles applied, defendant had every opportunity at sentencing to present mitigating circumstances, including his youth. Through the sentencing hearing, PSI report, and written psychological report, the court was able to consider the relevant

*Miller* factors of defendant's age of 20 (adulthood), his particular immaturity, impulsivity, and failure to appreciate risks and consequences; his family and home environment; defendant's degree of participation in the murder and the pressure his father placed on him; defendant's mental capacity and any incompetence given his low IQ versus his one year of advanced education; and defendant's prospects for rehabilitation, including his lack of a criminal background and good behavior with family. See *People v. Bickham*, 2017 IL App (1st) 142894-U, ¶¶ 21-22, 55-60 (detailing defendant's sentencing hearing); see also *People v. Lusby*, 2020 IL 124046, ¶ 34 (noting the *Miller* factors); *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 72 (noting, the proportionate penalties clause demands consideration of the defendant's character).

¶ 57      While the trial court did not expressly find defendant was incorrigible and lacking the necessary rehabilitative potential for useful citizenship, the trial court made such an implicit finding. See *Lusby*, 2020 IL 124046, ¶ 35 (in response to an eighth amendment challenge, noting that no single *Miller* factor is dispositive, but a reviewing court must "ensure that the trial court made an informed decision based on the totality of the circumstances that the defendant was incorrigible" and the sentence was appropriate). As set forth, the trial court noted that although defendant knew the difference between right and wrong, his character was such that he chose to participate in the murder even after some time had passed in planning it and even given the opportunity to foil the murder plot by contacting his mother. The court essentially considered the *Miller* factors but found that notwithstanding, defendant still deserved 50 years in prison out of a possible 35 years to life. See *Bickham*, 2017 IL App (1st) 142894-U, ¶ 54. Defendant's sentence was consonant with the term of 95 years given to his father, whom the trial court called the worst of the three participants, and the term of 70 years given to the hitman. See *id*., ¶ 3; *cf. House*, 2019 IL App (1st) 110580-B, ¶ 46 (noting the codefendants' incongruent sentences in comparison to the

defendant's supported the proportionate penalties violation). Thus, "[t]he defendant's *de facto* discretionary life sentence passes constitutional muster under *Miller*," assuming *Miller* applies. See *Lusby*, 2020 IL 124046, ¶ 52. Having found this, I do not believe the sentence violates the proportionate penalties clause either.

¶ 58    Last, while defendant's postconviction petition cites both *Miller* and *House* (reciting part of the holding in *House*), and it's well-established that first-stage petitions must be liberally construed, I find the claim in defendant's petition amounts more to a garden variety sentencing challenge than a constitutional claim. See *People v. Jones*, 213 Ill. 2d 498, 505 (2004) (a claim not raised in a petition cannot be argued for the first time on appeal). In his petition, defendant alleged that the trial court basically failed to consider his youth along with other mitigating circumstances, like his psychological problems and manipulative father. Defendant did not allege that *Miller* should extend to 20-year-old defendants like himself or note anything related to evolving science on juvenile maturity and brain development. Thus, there is no constitutional claim or record to further develop here, which distinguishes this particular case from *Harris* (see majority order, supra ¶ 35). And, as the State notes, defendant's same sentencing challenge, which included the trial court's failure to consider defendant's youth and rehabilitative potential, was extensively reviewed and then rejected by this court on direct appeal. See *Bickham*, 2017 IL App (1st) 142894-U, ¶ 55-60.

¶ 59    Based on the foregoing, I find the record contradicts defendant's claim in his postconviction petition that the trial court failed to consider defendant's youth alongside his participation in the murder or that his sentence violates the proportionate penalties clause. See *Hodges*, 234 Ill. 2d at 17. For that reason, I do not believe defendant's petition meets even the low threshold for first-stage postconviction proceedings.