2021 IL App (1st) 172478-U

FIRST DIVISION
July 26, 2021

No. 1-17-2478

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 13 CR 6768 |
| | ) ) | |
| JAMES ROMAINE, | ) ) | Honorable Frank Zelezinski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Justice Coghlan concurred in the judgment.
Justice Hyman specially concurred.

## ORDER

¶ 1    *Held*:   Defendant was proven guilty beyond a reasonable doubt.  The offenses did not occur as part of a single course of conduct, so his consecutive sentences are proper.   His sentence is not excessive and does not violate the eighth amendment or the proportionate penalties clause.

¶ 2    Defendant, James Romaine, was convicted of nine counts of aggravated criminal sexual assault, one count of armed robbery, and two counts of aggravated kidnapping following a bench trial.  On appeal, he argues: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the offenses he was convicted of occurred as part of a single course of conduct with no

substantial change in the criminal objective and, therefore, the consecutive sentencing statute's limitation on aggregate terms applies; (3) his sentence violates the eighth amendment and the proportionate penalties clause; (4) his sentence is excessive; and (5) his convictions for aggravated kidnapping violate the one act, one crime rule. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                                                                BACKGROUND

¶ 4     On March 28, 2013, defendant and co-defendant Cedric Chambers[1], were charged with aggravated criminal sexual assault, home invasion, armed robbery and aggravated kidnapping. The State went to trial on nine counts of aggravated criminal sexual assault, one count of armed robbery, and two counts of aggravated kidnapping. Following a bench trial, the court found the defendant guilty on all counts. Judge Zelezinski sentenced defendant to consecutive 12-year terms on each aggravated criminal sexual assault count, a concurrent 12-year term for armed robbery, a concurrent 12-year term on one of the aggravated kidnapping counts, and 18 years on the other aggravated kidnapping count, consecutive to the aggravated criminal sexual assault counts, for a total of 126 years' imprisonment. On August 2, 2017, the Honorable Carl Boyd presided over a hearing on defendant's motion to reconsider his sentence. Judge Boyd resentenced defendant to consecutive 7-year terms on each aggravated criminal sexual assault count, which totaled 70 years. Defendant appealed.

¶ 5     The evidence at trial established that on February 28, 2013, at approximately 9:00 p.m., F.J. returned to her home in Park Forest, Illinois, after work. She parked her car in her car port next to her home and walked to the side door of her house. She immediately noticed that her

---

[1] Cedric Chambers is not a party to this appeal. Prior to defendant's trial, Chambers pled guilty to aggravated criminal sexual assault in exchange for an 18-year sentence. He testified at defendant's trial.

back-porch door was open and left her keys in the side door to investigate. As she walked towards the open door, she noticed that her cabinets and drawers in the adjacent kitchen were open.

¶ 6    F.J. walked into the kitchen and could see two silhouettes in the dark living room.  She noticed that part of her front door was open, but the storm door was closed. F.J. thought if she yelled loudly, she would scare the people out the front door of her house. But instead of running away, the two figures rushed towards her. F.J. testified that she thought the taller individual was holding the gun and he raised it and pointed it at her with his finger on the trigger as he quickly rushed towards her. Within seconds she was forced face down on her kitchen floor.

¶ 7    F.J. testified that the men were very careful not to let her see their faces. She could only establish that these two individuals were black males, that one was taller, and one was shorter, and that based on their physique, they were not over the age of thirty. They repeatedly told her that if she looked at their faces, they would harm her or kill her.  Throughout the entire time she was with the offenders, she was forcibly held down, with her head below her waist. As such, F.J. was only ever able to see the offenders' bodies.

¶ 8    As she lay face down on her kitchen floor, the two men went through her purse and bags looking for money.  They threatened her.  F.J. testified that the taller of the two men was mostly the one who talked and told her that "this is going to get worse for you we know you have the money." As she lay on the kitchen floor, one of the offenders hit F.J. on the right side of her face with his hand but believed there was something in his hand when he hit her.  She believed it was the taller offender who hit her. She was hit a couple of times, but lost count of how many times.

F .J. testified that the taller offender was clearly in charge as he made all of the decisions, all of the plans and did all of the talking.

¶ 9     The men demanded her money and F.J. them that she did not have any cash on her.  She offered to give them her wallet.   They told F.J. things were going to get worse for her.  They told her to take her pants off and  F.J. did what the offenders demanded.  The offenders held F.J. on the floor as she was lying on her stomach. They stood behind and over her and repeatedly assaulted her by forcing their fingers inside of her vagina. F.J. believed that the men traded places while assaulting her with their fingers but could not see because her face was held to the floor.  They continually demanded money and accused her of  "holding out on them." After approximately ten minutes, F.J. was forced, by her hair, down the hallway and into her bedroom.

¶ 10    Once in her bedroom, the men bent her over her bed with her feet remaining on the ground and her face in the mattress. She was naked from the waist down.  The shorter man positioned himself in front of her with his knees on the bed and his penis in F.J.'s face and forced F.J. to give him oral sex. As she was giving oral sex, the taller man was behind F.J. attempting to vaginally rape her with his penis.  F.J. testified that this "went on over and over with the guy in front forcing his penis in [her] mouth and the guy in back ramming [me] from behind." Eventually, the two men switched places.  F.J. testified that as she was being "tortured," she was trying to pull herself away and was pretending to be somewhere else.

¶ 11    When they were finished, the men took her back into the kitchen and  continued to ask about money.  F.J.  told the men to take anything they wanted.  The men wanted her to go in a car and she asked them if she could put her pants back on because it was cold outside, which they allowed.  The men got F.J.'s keys from the side door where she had left them after first

entering. The offenders also gathered F.J.'s laptop with a memory stick, cell phone, I-Pad, I-Pod, wallet and purse.

¶ 12    F.J. was forced to leave her house through the front door. Although she did not see the gun, she felt something hard at her back. One of the offenders was always holding onto F.J. or pushing her down to prevent her from standing up straight. They "shoved" F.J. in the back passenger door of her car. The shorter offender got in the back seat with F.J. and the taller offender got into the driver's seat. Her head was held down and her face was on the car seat. One of the men continued to tell her that things were going to get worse for her and that they knew she had money.

¶ 13    The men drove F.J. around, stopping multiple times, for approximately thirty or forty minutes. When they stopped the first time, they demanded the PIN to her credit cards. F.J. testified that she may have given them cards that did not work, or the wrong PIN to an expired card, and this made them angry. F.J. testified that she was not trying to trick them, but she was stressed. She thought if she cooperated and gave them money, they would stop hurting her.  They went through bank ATMs, a convenience store, a gas station and a liquor store.  The taller offender made F.J. think that she was not being cooperative by telling her it was only going to get worse if she did not cooperate. They also made her think they were not getting any money; however, she learned later that they did get money from her account. Throughout the time in the car, the taller man encouraged the shorter offender to periodically force F.J. to perform oral sex on him in the back seat.  This occurred more than three times, to the point she could not breath and she felt like she was suffocating.

¶ 14    The second to last time the car stopped F.J. thought they were back in Park Forest because the house's roof tops looked familiar. She was held down, as the taller offender got out

of the front, opened the passenger door, and pushed F.J. over. The taller man was on F.J.'s right side and the shorter man was on her left. F.J. was forced to perform oral sex on the shorter offender and the taller man pulled F.J.'s pants down and made contact with his penis to F.J.'s vagina. The men then forced F.J. to turn around so that she was then forced to have the taller offender's penis in her mouth while the shorter offender vaginally raped her with his penis. F.J. testified that that this "was the roughest, longest duration of the sexual assault, and it was both of them."

¶ 15 The taller offender got back in the driver's seat and drove the car a few blocks, before stopping again. The men made F.J. crouch down on the floor of the backseat, with her knees on the floor. The shorter offender then got out of the car while the taller offender stayed in the front seat, "fussing" with the steering wheel and the dashboard. He eventually got out of the car. F.J. heard them talking on the sidewalk before she heard a car door slam and drive away.

¶ 16 F.J. testified that she stayed in the car for a while, but eventually became brave enough to look out of the window. She recognized that she was a few blocks away from her house. The keys to her car were gone, so she got out of the car and started running towards her house. As she was running, she saw a police car with its lights on, and as she approached her house, she saw police officers and her neighbor outside.

¶ 17 F.J. was taken by ambulance to St. James Hospital where a sexual assault kit was completed, and her clothing was collected. F.J. suffered a black eye, red marks to the right side of her face and her face was swollen as a result of being beaten. In addition to the injuries to her face, she also had severe back pain from being forced to the ground in the kitchen and from being bent over and held down.

¶ 18 Co-defendant Cedric Chambers testified defendant picked Chambers up in defendant's

car on the day of the offense. As Chambers approached the car, defendant told Chambers to go back inside and get a "hoody," which he did. They drove to defendant's house and defendant went inside and came back with a BB gun. They drove a few blocks before defendant told Chambers to "follow him" because they were going to "go on a stain." Chambers understood that to mean they were going to rob someone. Defendant had the BB gun with him. They jumped over some fences and defendant stopped at a house with a sunroom. Chambers did not know who lived at the house. Defendant opened the door by breaking the glass and reaching in and unlocking the lock. Chambers followed him inside. Defendant took a butcher knife from inside the house and gave it to Chambers. Chambers testified that he put the knife down on the kitchen counter before he went into the living room. He identified a photograph of the knife he had been holding on the floor by the front door but testified that he did not remember how it ended up in the living room.

¶ 19　Chambers testified that defendant went into one of the bedrooms while Chambers stayed in the living room by the front door. Chambers heard a noise in the bedroom and, when he went to check, he saw defendant inside the bedroom, which was in disarray with the mattress slid partly off the bed and the drawers and a closet open. Defendant told Chambers that there was nothing in the bedroom.

¶ 20　Chambers then went to the living room and saw a car in the driveway. He tried to get out the front door, but as he started to turn the lock, a woman, F.J., walked through the kitchen with two of her dogs. Chambers testified that defendant, who was standing with him in the living room, raised and pointed the gun at F.J. and said, "don't move." Defendant went into the kitchen, dumped F.J.'s purse out, and told Chambers to come into the kitchen. Defendant had F.J.'s laptop, and he gave Chambers F.J.'s tablet and iPhone from F.J.'s purse. Defendant also took

F.J.'s credit cards. He ordered F.J. to the ground and asked her for the PINs to her credit cards. F.J. responded that "it was chipped." Defendant then struck F.J. with his hands, punching her in the face, while demanding her PIN's.

¶ 21    Chambers testified that defendant told F.J. to pull her pants down as she lay on the kitchen floor and when she did defendant put his fingers inside F.J.'s vagina. Defendant then told Chambers to turn around, which he did. Chambers did not see what defendant did next to F.J., but he thinks defendant put his penis in her mouth. Chambers testified that he did not touch F.J. while they were in the kitchen. When defendant finished, he told F.J. to get up and he led her to her bedroom in a headlock with the gun to her head. Chambers followed them with F.J.'s laptop, iPad and iPhone.

¶ 22    Chambers testified that defendant then took F.J. inside the bedroom and closed the door halfway. Chambers could see defendant and F.J. inside of the room through the partly open door. Defendant had F.J. bent  over the end or side of the bed, with her feet on the floor.   He saw defendant take his penis out and put it inside F.J.'s vagina. Chambers testified that he was looking around while he was in the hallway because he was "disgusted" by what he saw. About two minutes later, defendant told Chambers to come inside.  Defendant was still behind F.J. with his penis in her vagina, "having sex" with her. Chambers testified that he did not want to go into the bedroom, but defendant had a gun.

¶ 23    Chambers entered the bedroom and defendant commanded him "to get some head from her," so he inserted his penis into her mouth, as defendant was "having sex" with her from behind. Defendant stopped and told F.J. to turn around. He again asked her for her PIN's, and she continued to reply that it was "chipped." Defendant hit her in the face, arm and back. Defendant told F.J. to give them both oral sex, but she only did it to defendant.   Chambers stated

that he and defendant did not switch places while they were in the bedroom.

¶ 24    Chambers then went to find the keys.  When he returned to the living room, defendant was holding F.J. in a headlock, bent over, with the gun pointed at her head.  They left the house and went to F.J.'s car. Chambers had F.J.'s iPad, cell phone and laptop. Defendant had all of her credit cards. Defendant got in the front and Chambers got in the back with F.J.  Chambers put the gun in the back window.

¶ 25    Defendant first drove to a bank in Park Forest, and then to an ATM in Matteson. Chambers did not remember if defendant withdrew any money on the first or the second stop.  At the third stop, defendant withdrew somewhere between $200 and $400 dollars using F.J.'s card. Defendant  gave some of that money to Chambers. They then went to a Shell gas station and a liquor store where defendant went inside and came out with a fifth of Hennessey, which they started to drink. Defendant told Chambers to "get some more head," so he took his penis out and put it into F.J.'s mouth as defendant drove F.J.'s car.

¶ 26    About a block later, defendant got in the backseat and inserted his penis into F.J.'s vagina.  Chambers stated that he put his penis in F.J.'s mouth, but he did not have an erection. Defendant then told F.J. to turn around and Chambers touched his penis to her vagina, but he still did not have an erection. F.J. was performing oral sex on defendant.  After about two minutes, defendant told Chambers to wait while he got the car. Defendant took the navigation system from the car and four or five of F.J.'s credit cards and went to his car. Chambers collected the gun, iPad, laptop and cell phone. Defendant told F.J. to lie down.  Chambers testified that neither he nor defendant wore a condom that night.

¶ 27    They stayed at Chambers' house that night. They went to defendant's house so he could change his clothes.  They stopped at a few locations, including two gas stations where defendant

took out additional money. Defendant split the money with Chambers. They then went to Walmart where they attempted to buy some televisions with F.J.'s credit cards, but they were unsuccessful. While they were on their way to another store they were pulled over and arrested.

¶ 28    Chambers testified that he was sixteen years old and six feet tall at the time of the offense. He was taller than defendant. Chambers viewed video footage from two banks and a Shell gas station and testified that these were locations they went to while defendant was driving F.J.'s car and while he was in the backseat with F.J., and he identified defendant outside of the car in two of the videos. He also identified video surveillance from a Speedway gas station and Walmart as the locations he and defendant went to prior to being arrested. He identified defendant's car in the Speedway video, and he identified himself and defendant entering and exiting the Walmart.

¶ 29    Park Forest Department Deputy Chief Paul Finley testified that in February 2013, he was Commander of the Investigation Unit and was one of the officers who arrested defendant. Commander Finley stated that a custodial searched of defendant yielded a large amount of United States Currency as well as a red iPod, which displayed F.J.'s first name when Commander Finley powered it on at the police station. Commander Finley testified that defendant was five feet, eleven inches when he was arrested.

¶ 30    Detective Kristopher Vallow testified that Chambers' height was 5'10" when he was arrested. Detective Vallow testified a search of Chambers' house on March 2, 2013, yielded a BB gun under a mattress in Chambers' bedroom. Chambers identified this BB gun as the one defendant used the night F.J. was assaulted.

¶ 31    The parties stipulated to the testimony of Registered Nurse Danyelle Hubbard's testimony. Hubbard testified that on March 1, 2013, she examined F.J. at St. James Hospital.

Hubbard observed a one-half centimeter skin tear on F.J.'s vagina as well as bruising and swelling around F.J.'s right eye and cheek.

¶ 32    Forensic scientist Jamie Jett was qualified as an expert in the field of microscopy and testified that he received a black knit hat and black hooded sweatshirt, recovered from defendant's house, and that he collected hairs using a process called taping. Jett determined that five hairs collected were Caucasian head hairs but was unable to determine further details from the hairs. Mr. Jett prepared four hairs for further DNA testing.

¶ 33    Forensic biologist Katherine Sullivan was qualified as an expert in forensic biology and DNA analysis. Sullivan testified that she received F.J.'s criminal sexual assault kit which contained vaginal, anal and oral swabs, as well as paper and cloth items from the crime scene. Sullivan did not identify any semen in those swabs or the items from the crime scene. She further testified that she was not able to generate a DNA profile from the oral and vaginal swabs because there was not enough male DNA. Sullivan was also unable to generate a DNA profile from F.J.'s fingernail scrapings.

¶ 34    Sullivan also received four different hair portions that had been prepared for DNA analysis by  Jett. Sullivan generated DNA profiles from these items and determined that female DNA from F.J. was a match to the DNA profile from these items.

¶ 35    At the conclusion of this evidence and after closing arguments, Judge Zelezinski found defendant guilty of all counts, noting that F.J.'s testimony was "a story out of a horror novel." Judge Zelezinski sentenced defendant to an aggregate sentence of 126-years in prison.

¶ 36    On August 2, 2017,  Judge Carl Boyd heard defendant's motion to reconsider his sentence. Judge Boyd read Judge Zelezinski's sentencing transcript and found that the 126-year sentence "is essentially the death penalty," and he resentenced defendant as follows: 7 years on

11

each count, with all counts of the aggravated criminal sexual assault charges and one count of aggravated kidnapping running consecutive, and the remaining counts of aggravated kidnapping and armed robbery running concurrently, for a total of 70 years. Defendant appealed.

¶ 37                                ANALYSIS

¶ 38    Defendant argues that the State failed to prove beyond a reasonable doubt that F.J. suffered bodily harm contemporaneous to the sexual assault as required by the aggravated criminal sexual assault statute. As such, defendant urges, his five aggravated criminal sexual assault convictions should be reduced to criminal sexual assault.

¶ 39    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regards to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 40    To sustain a conviction for aggravated criminal sexual assault, the State was required to prove defendant committed an act of sexual penetration through force or threat of force and during the commission of the offense defendant caused bodily harm to the victim. 720 ILCS 5/11-1.30

(a)(2) (West 2018). The term "bodily harm," although difficult to precisely define, requires physical pain or damage to the body, *i.e.*, lacerations, bruises or abrasions, whether temporary or permanent. *People v. Mays*, 91 Ill. 2d 251, 256 (1982). In determining whether a defendant's actions caused bodily harm, the trier of fact may consider direct evidence of an injury and may equally infer an injury based upon circumstantial evidence in light of common experience. *People v. Bishop*, 218 Ill.2d 232, 250 (2006). The aggravated criminal sexual assault counts in this case that were based on the alleged bodily harm of "str[iking] F.J. about the face." Defendant argues that the bodily harm suffered by F.J. was not committed during the offense. We disagree.

¶ 41    The evidence in this case clearly established that defendant caused F.J. bodily harm during the commission of the sexual assault. F.J. testified at trial that defendant and Chambers rushed at her in the kitchen and forced her to the floor. As she lay there, one of the two men struck her in the face. She was hit several times. Defendant and Chambers demanded money and then instructed her to take off her pants. They then held her down and repeatedly sexually assaulted her with their fingers, while demanding money. After about ten minutes, defendant and Chambers stood F.J. up, but kept her bent over, grabbed her by her hair and forced her down the hallway to her bedroom. Chambers substantially corroborated F.J.'s testimony regarding what occurred in the kitchen. He denied touching F.J. at that time. Chambers did testify that once they were in F.J.'s bedroom, that defendant struck F.J. in her face, arm and back after vaginally raping her but before he forced her to perform oral sex. The bodily harm suffered by F.J. clearly occurred just prior to and during the sexual assault and was sufficiently close in time to be considered during the course of the sexual assault.

¶ 42    Defendant next contends that the offenses he was convicted of occurred as part of a single course of conduct with no substantial change in the criminal objective and, therefore, the

consecutive sentencing statute's limitation on aggregate terms applies. The State responds that as an initial matter, defendant has forfeited any challenge that his sentence violated the sentencing statute's aggregate maximum term and has not shown that this claim warrants plain error review. We agree with the State.

¶ 43    "A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the circuit court clerk within 30 days following the imposition of sentence." 730 ILCS 5/5-4.5-50(d) (West 2016). It is well settled that to "to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). We therefore find defendant forfeited these issues.

¶ 44    Nonetheless, the defendant urges us to review the issue under the plain error doctrine. The plain error doctrine allows this court to bypass normal forfeiture principles and consider an unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Magallanes*, 409 Ill. App. 3d 720, 727-28 (2011). The first step under either prong of the plain error doctrine is to determine whether a clear or obvious error occurred at trial. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58. We will accordingly determine if the consecutive sentence statue applies to the defendant.

¶ 45    When multiple offenses are committed in a single course of conduct during which there was no substantial change in the nature of the criminal objective, the sentence shall not exceed the sum of the maximum terms for the two most serious felonies involved. 730 ILCS 5/5-8-4(f)(2) (West 2016).  In determining whether multiple offenses were committed as part of a single course of conduct, we must assess whether the defendant's acts were independently

14

motivated. *People v. Wilder*, 325 Ill. App. 3d 987, 1001 (2001). The determination of whether a defendant's actions constituted a single course of conduct is a question of fact for the trial court to determine. *People v. Edwards*, 259 Ill. App. 3d 151, 156 (1994). Therefore, we defer to the trial court's conclusion unless that conclusion is against the manifest weight of the evidence. *People v. Daniel*, 311 Ill. App. 3d at 287.

¶ 46 Defendant argues that the offenses in this case were part of a single course of conduct. The State responds that the offenses were not committed as part of a single course of conduct. The trial court did not make an express finding in this case as to whether the offenses committed on March 28, 2013, of which defendant was convicted, arose out of a single course of conduct. However, there is a presumption that a trial court knows the law and applies it. *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996); *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 103. Thus, we must presume that the trial court reasoned that there was a substantial change in defendant's criminal objective and that the consecutive sentences imposed were authorized by statute. *Cf. People v. Sergeant*, 326 Ill. App. 3d 974 (2001).

¶ 47 The record supports this presumption. Chambers established that defendant's original criminal intent at the beginning of the night was to rob someone. That criminal objective was fulfilled after defendant and Chambers entered F.J.'s home and robbed her of her credit cards, phone, iPad, and laptop. Defendant's criminal objective then changed from robbing F.J. to sexually assaulting her in her home. The objective then changed to kidnapping F.J. Defendant and Chambers again forcefully raped F.J. as she was held against her will in the back seat of the car. This was a completely separate sexual assault, different in time and location than the first two sexual assaults and was not part of the same course of criminal conduct that occurred in her home. See *People v. Perruquet*, 118 Ill. App. 3d 293, 296-97 (1983) (finding that the defendant

formed separate criminal objectives where "the defendant committed two acts of rape against the victim that were separate in time and location" even though they occurred during the same day). We therefore reject the defendant's argument that his offenses were committed as part of a single course of conduct. Consequently, the trial court did not err by failing to sentence the defendant in accordance with the consecutive sentencing statute. Since there was no error, there can be no plain error.

¶ 48    Defendant next argues that, because he was an "emerging adult who committed a non-homicide offense," his seventy-year sentence is a *de facto* life sentence which violates the Eighth Amendment and Illinois' Proportionate Penalties Clause as applied to him.

¶ 49    The eighth amendment's prohibition of "cruel and unusual punishment[ ]" applies to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV; *People v. Davis*, 2014 IL 115595, ¶ 18. In *Miller v. Alabama*, 567 U.S. 460, 471-80 (2012), the United States Supreme Court held that mandatory life sentences imposed on juvenile offenders, those under the age of 18 at the time of the offense, violate the eighth amendment because this prevents the sentencing court from considering the mitigating aspects of youth, *i.e*., their immaturity, impulsivity, and increased vulnerability to negative influences. Our supreme court has since determined that *Miller* applies to mandatory, discretionary, natural, or *de facto* life sentences imposed on juveniles. *People v. Holman*, 2017 IL 120655, ¶¶ 40, 46; *People v. Reyes*, 2016 IL 119271, ¶ 9. It also drew the line for a *de facto* life sentence at 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Accordingly, "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing

court failed to consider youth and its attendant characteristics in imposing the sentence." *Id*. ¶ 27 (citing *Holman*, 2017 IL 120655, ¶ 40).

¶ 50    In this case it is undisputed that defendant was 22 years old at the time he committed the aggravated criminal sexual assaults at issue. "By now, it is clear that the categorical findings made by *Miller* and its progeny under the federal eighth amendment apply only to juveniles." *People v. Harris*, 2018 IL 121932, ¶¶ 49-61 (collecting cases and stating that the 19-year-old defendant "cannot avail himself of the eighth amendment" under *Miller*). "[C]laims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Id.* ¶ 61. "It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases." *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 49.  Therefore, defendant's eighth amendment challenge fails.

¶ 51    Forfeiture aside, defendant also makes an as applied challenge to his sentence under the proportionate penalties clause.  The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our courts have construed the clause to extend greater protections against excessive punishment than the eighth amendment. *People v. Fernandez*, 2014 IL App (1st) 120508.  A defendant's sentence violates the proportionate penalties clause where "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). To comply with the proportionate penalties clause, the court must balance the goals of retribution and rehabilitation, carefully considering all factors in aggravation and mitigation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). "To determine whether a penalty shocks the moral sense of the community, we must consider objective

17

evidence as well as the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 52    *Miller* has recently been expanded to apply to those over 18.   Our supreme court has acknowledged that young adults, at least those who were 20 years of age or younger at the time of their crimes, may still rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11).  *People v. Thompson*, 2015 IL 118151, ¶ 44 (19-year-old defendant was "not necessarily foreclosed" from raising claim in postconviction proceedings that sentence was unconstitutional as applied to him), and *People v. Harris*, 2018 IL 121932, ¶ 48 (as-applied, youth-based sentencing claim of 18-year-old defendant was "more appropriately raised" in postconviction proceedings where a factual record could be developed)). See also *People v. Evans*, 2021 IL App (1st) 172809, ¶ 16 (our supreme court has "opened the door for young adult offenders to demonstrate that their own specific characteristics at the time of their offense were so like those of a juvenile that the imposition of a life sentence, absent the safeguards established in *Miller*, violates the proportionate penalties clause"); *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 51 ("Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause rather than the eighth amendment").

¶ 53    Nevertheless, in this case, defendant was 22 years old at the time he committed the offenses, which is well past the 18-to-21-year-old group of defendants who have successfully asserted as-applied *Miller*-based claims under the proportionate penalties clause. See *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 27 (observing that the *Miller*-based protections "were applied to under-18-year-olds and which have been arguably extended in some cases and statutes

to under-21-year-olds"). Defendant fails to provide any authority where a 22-year-old offender received the special considerations set forth in *Miller*. "[Defendant] can point to no case in which an Illinois court has recognized that a life sentence imposed on a young adult—21 or older as [defendant] was—is unconstitutional as applied to that offender under the proportionate penalties clause or the eighth amendment." *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33. "The evolving science on brain development may support such claims at some time in the future, but for now individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *Id*. "While 21 is undoubtedly somewhat arbitrary, drawing a line there is in keeping with other aspects of criminal law and society's current general recognition that 21 is considered the beginning of adulthood." *Id*. ¶ 34.

¶ 54    Even so, defendant had a *Miller* compliant sentencing hearing. At the sentencing hearing before Judge Zelezinski, for this 22-year-old adult, defendant had the opportunity present any and all evidence he believed mitigated his offense. Defense counsel zealously represented defendant in this respect. As demonstrated by the record, Judge Zelezinski properly considered all mitigation where he explicitly considered defendant's social history, education, criminal history, family life and potential for rehabilitation but still sentenced defendant to 126 years in prison.  Judge Boyd then presided over defendant's re-sentencing hearing and significantly reduced the defendant's sentence by 56 years to an aggregate term of 70 years, noting that he read Judge Zelezinski's sentencing transcript. While Judge Boyd agreed with many of the aggravating factors Judge Zelezinski relied on, he also found that the 126-year sentence to be "essentially the death penalty," and he resentenced defendant to just ten years over the minimum. As in *People v. Croft*,  2018 IL App (1st) 150043, *appeal denied*, 98 N.E. 2d 28 (2018), *cert denied* 139 S. Ct. 291 (2018), the trial court in this case had before it the trial testimony, the

evidence, defendant's presentence investigation, and the sentencing arguments of the parties before it sentenced defendant. Further, defendant's age was the driving force behind Judge Boyd's substantial reduction in defendant's sentence. As a result, the trial court considered the same factors the *Holman* court found to be constitutionally consistent with *Miller*.

¶ 55    In short, defendant was afforded the opportunity to develop a factual record in an effort to show that his specific characteristics were so like those of a juvenile that the sentence imposed violated the proportionate penalties clause, absent the safeguards set forth in *Miller*. Given this extensive factual record and our analysis set forth above, defendant's sentence does not shock the moral sense of the community in violation of the proportionate penalties clause.

¶ 56    We also reject defendant's argument that his 70-year sentence is excessive.  The trial court must consider both the seriousness of the offense and the defendant's rehabilitative potential at sentencing. Ill. Const. 1970, art. I, § 11.  A trial court's sentencing decision is granted considerable deference and we will only disturb that sentence if we find the trial court has abused its discretion. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). This is because the sentencing court is better situated to consider the "defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 57    The seriousness of a defendant's crime is the most important consideration at sentencing. *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 51. The sentencing court will be presumed to have considered all relevant factors in mitigation, "absent some indication to the contrary other than the sentence itself." *People v. Thompson*, 222 Ill. 2d 1, 45 (2006). Mitigating factors such as rehabilitative potential are not entitled to greater weight than aggravating factors. *Alexander*, 239 Ill. 2d at 214 (citing *People v. Coleman*, 166 Ill. 2d 247, 261 (1995)). The reviewing court should not substitute its judgment for that of the sentencing court when weighing factors in mitigation

and aggravation. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21.

¶ 58    As discussed, the record in this case clearly demonstrates that the trial court did not abuse its discretion in crafting defendant's 70-year sentence.  Defendant was initially sentenced to an aggregate term of 126 years in prison. In calculating that sentence, Judge Zelezinski stated that he had reviewed the pre-sentence investigation report which detailed defendant's social life, education, criminal background,amongst many other things. In mitigation, the court considered defendant's supportive family life and noted that nothing extremely aggravating came from defendant'seducational, family or financial background.  The court also considered the lack of defendant's adult and juvenile background and noted that defendant received boot camp for his prior felony conviction, which had the goal of giving offenders without extensive backgrounds, or youthful offenders, a "chance to go along life without committing further crimes." The court specifically considered defendant's rehabilitative potential finding such potential was "nil." Then, at defendant's resentencing hearing, Judge Boyd significantly reduced the defendant's sentence by 56 years to an aggregate term of 70 years, to be served at 85%. Judge Boyd specifically noted that he read Judge Zelezinski's sentencing transcript but did not want defendant to spend the rest of his life in jail.   The court carefully considered all of the necessary factors in arriving at  a 70-year sentence.

¶ 59    Defendant lastly argues that his conviction for armed robbery must merge into his conviction for aggravated kidnapping since it is a predicate felony; his aggravated kidnapping convictions must merge into each other where they are based on the same act; and the one remaining aggravated kidnapping conviction must merge into one of the aggravated criminal sexual assault convictions based on kidnapping where it is a predicate, aggravating felony, thereby reducing his sentence to an aggregate term of 63 years.

¶ 60    Defendant has acknowledged that he forfeited his one-act, one-crime argument by failing to raise it before the trial court, but he seeks review under the plain error doctrine. The plain error doctrine allows a reviewing court to consider an unpreserved error "(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Sebby,* 2017 IL 119445, ¶ 48.  Our supreme  court has previously explained that one-act, one-crime violations fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010); see also *People v. Artis*, 232 Ill. 2d 156, 168 (2009).  Despite the forfeiture, we will address defendant's argument under the second prong of the plain error doctrine.  However, we must first consider whether a one-act, one-crime error occurred.

¶ 61    In *People v. King*, 66 Ill. 2d 551, 566 (1977), our supreme court held that a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act. In making that determination, this court has long followed a two-step analysis. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts. *Id*. If it is determined that the defendant committed multiple acts, the court then moves to the second step and determines whether any of the offenses are lesser-included offenses. *Id.* To determine whether one offense is a lesser included offense of another, we apply the " 'abstract elements' " approach. *People v. Reveles-Cordova*, 2020 IL 124797, ¶ 13. "This approach requires the court to examine

the statutory elements of the two offenses." *Id.* " 'If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second.' " *Id.* (quoting *People v. Miller*, 238 Ill. 2d 161, 166 (2010)). "In other words, it must be impossible to commit the greater offense without necessarily committing the lesser offense." *Id.* If none of the offenses are lesser-included offenses, then multiple convictions are proper. *Id.* Whether a violation of the rule has occurred is a question of law, which we review *de novo*. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008).

¶ 62    The State concedes, and we agree, that defendant's conviction for aggravated kidnapping in count 113 should merge into his aggravated kidnapping conviction in count 118 where they are based on the same act of transporting F.J. from her house and secretly confining her in her car. However, the State argues that defendant's remaining conviction for aggravated kidnapping in count 118 does not violate the one act, one crime doctrine and is proper.

¶ 63    Defendant argues that he may not be convicted of both armed robbery and aggravated kidnapping and the aggravated sexual assaults predicated on those crimes. In his motion to cite additional authority, defendant argues that *People v. Reveles-Cordova*, 2020 IL 124797, supports his position. In *Reveles-Cordova*, our supreme court was charged with determining how the abstract elements test applied to the offense of home invasion when the defendant was charged with criminal sexual assault and home invasion predicated upon criminal sexual assault. The court held:

> "Proof of criminal sexual assault is a necessary element of proof of home invasion predicated on criminal sexual assault. All the elements of criminal sexual assault are included in the offense of home invasion predicated on criminal sexual assault, and

criminal sexual assault contains no element not included in home invasion. It is impossible to commit home invasion predicated upon criminal sexual assault without committing criminal sexual assault. As such, criminal sexual assault is a lesser-included offense of home invasion." 2020 IL 124797, ¶ 21.

¶ 64 We find that *Reveles-Cordova* does not support defendant's assertion that his aggravated kidnapping and armed robbery convictions should be vacated as lesser included offenses of the aggravated criminal sexual assault convictions. *Reveles-Cordova* is inapplicable to defendant's armed robbery conviction as none of the aggravated criminal sexual assault counts of which he was convicted are premised upon robbery or armed robbery. In addition, in this case, defendant was charged with two counts of aggravated criminal sexual assault predicated on kidnapping, but he was not convicted of the offense of kidnapping. Rather, he was convicted of the separate offense of aggravated kidnapping. As such, unlike *Reveles-Cordova*, defendant's aggravated kidnapping conviction contains an element not included in the aggravated criminal sexual assault, the use of a "dangerous weapon other than a firearm to wit: a bludgeon." Accordingly, defendant's conviction for aggravated kidnapping remains unchanged.

¶ 65                                      CONCLUSION

¶ 66 Based on the foregoing, the judgment of the circuit court is affirmed.

¶ 67 Affirmed.

¶ 68 JUSTICE HYMAN, specially concurring:

¶ 69 I join the majority's judgment and its reasoning save for paragraphs 53-55.

¶ 70 I remain of the view that retrospectively analyzing a young adult's sentencing hearing for compliance with *Miller v. Alabama*, 567 U.S. 460 (2012) neither makes sense nor is required under *People v. Holman*, 2017 IL 120655, ¶ 47 ("For *juvenile* defendants ***any inquiry into the *Miller* factors is backwards-looking") (emphasis added). As this court has elsewhere explained, we

cannot determine whether a sentencing hearing complies with *Miller* unless we can be sure the trial court was thinking of the young adult in front of them as a juvenile for constitutional purposes. See *e.g., People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 52; *cf. also People v. Thompson*, 2021 IL App (1st) 180297-U, ¶ 49 (Hyman, J. dissenting) ("I fail to see how a trial court could possible have viewed the relevant sentencing facts in their proper constitutional scope when the law applying *Miller* principles to young adults through the proportionate penalties clause was and still is not settled.").

¶ 71 Accepting the majority's premise, however, I am still not at all convinced that Romaine's sentencing proceedings were compliant with *Miller* under *Holman*. At Romaine's sentencing hearing, his counsel did not mention his age, let alone argue that the constitutional protections afforded to juveniles under *Miller* should apply to him under the proportionate penalties clause. The trial court similarly made no mention of Romaine's age in explaining the factors that mitigated his sentence. Romaine's boilerplate motion to reconsider his sentence made no mention of his age, *Miller*, or the proportionate penalties clause. At the hearing on the motion to reconsider sentence, Romaine's counsel similarly made no argument about extending *Miller* protections to him as a young adult. Finally, after granting Romaine's motion to reconsider and recrafting his sentence, the trial court again did not account for Romaine's age or view his rehabilitative potential through any constitutional lens.

¶ 72 Of course, the trial court need not recite "magic words" reflecting its understanding of Romaine's youth. See *People v. Lusby*, 2021 IL 124046, ¶ 33. Nonetheless, to be *Miller*-compliant, it was obligated "to consider the defendant's youth and its attendant circumstances in mitigation." Here, nothing in the record suggests that the trial court, aside from its awareness of Romaine's chronological age, considered his youth as mitigating.

¶ 73    Of course, this analysis assumes *Miller* applies to Romaine. And here is where my company rejoins the majority. The majority correctly finds that Romaine had the opportunity to argue that *Miller* should apply to him as a young adult. At the time of Romaine's sentencing hearing, the theory of invoking the proportionate penalties clause to protect young adults under *Miller* was nascent, to be sure, but those arguments had already percolated to our supreme court the year before in a different procedural context. See *People v. Thompson*, 2015 IL 118151. So the majority correctly finds Romaine's claim fails for lack of factual development; in other words, the same reason that the majority should refrain from finding his sentencing was *Miller* compliant.

¶ 74    I join the majority's judgment with two additional understandings. First, nothing in this order precludes Romaine from developing a proportionate penalties clause argument against his sentence in postconviction proceedings either with new evidence or through a claim of ineffective assistance of counsel. See *People v. Harris*, 2018 IL 121932, ¶ 48. Second, should Romaine pursue this relief, the court considering his claims should not feel bound by the majority's *dicta* musing that *Miller*'s cutoff under the proportionate penalties clause is 21 years old. No decision from our supreme court sets a cutoff, and the relevant social science presented in other cases suggests juvenile brain development may continue until age 25. See *People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 55-56, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020).

¶ 75    Because Romaine has not factually developed his claim that *Miller* should apply to him as a young adult, I join the majority's judgment. Because after acknowledging the lack of factual development, the majority speculates about how the law applicable to juveniles would apply to Romaine's current sentencing proceedings, I do not join its reasoning.